[No. B206799. Second Dist., Div. Three. Jan. 27, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
BENNIE T. NERO et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part I. of the Discussion.

**COUNSEL**

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Bennie T. Nero.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Lisa L. Brown.

Edmund G. Brown, Jr., Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Yun K. Lee and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

## ALDRICH, J.—

## INTRODUCTION

In *People v. McCoy* (2001) 25 Cal.4th 1111 [108 Cal.Rptr.2d 188, 24 P.3d 1210] (*McCoy*), our California Supreme Court held that an aider and abettor may be found guilty of *greater* homicide-related offenses than those the actual perpetrator committed. Extending that holding, we conclude that an aider and abettor may be found guilty of *lesser* homicide-related offenses than those the actual perpetrator committed. This case presents compelling facts for that conclusion. Defendant and appellant Bennie T. Nero stabbed Milton Yates with a knife, killing him. The prosecution's theory of the case was that Nero's codefendant and coappellant Lisa Brown aided and abetted him by handing him the knife. Both defendants were charged with murder. The jury was instructed on, among other theories, first and second degree murder, voluntary manslaughter, and aider and abettor liability. During deliberations, the jury asked if they could find Brown, the aider and abettor, guilty of a greater or a lesser homicide-related offense than Nero, the direct perpetrator. They were told that principals in a crime are equally guilty. The jury then found Nero and Brown equally guilty of second degree murder. In the published portion of this opinion, we hold that the instruction was prejudicial error, and the judgment as to Brown must therefore be reversed. In the unpublished portion of this opinion, we affirm the judgment as to Nero.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  *Factual background.*

   A.  *The prosecution's case-in-chief.*

On September 27, 2006, Milton Yates was found stabbed to death in a parking lot fronting a laundromat and a market. Videos from the laundromat's and market's surveillance cameras showed Yates riding a bicycle in the parking lot.[1] Nero and Brown came out of the market. Brown got into a car,

---

[1] The market had three surveillance cameras and the laundromat had four cameras (People's exhibit 1).

but Nero remained outside, urinating. Yates rode his bicycle around the car, and Nero walked to him. Brown got out of the car and, after watching the two men, walked to them. Yates and Nero fought. At one point, Nero grabbed the back of his pants and bent near the back of his car. Nero stabbed Yates with a knife four times. Autopsy results showed that Yates ingested cocaine and ethyl alcohol within hours of his death.

Detective Sunny Romero examined Yates's bicycle, but he did not find it possessed any evidentiary value. A photograph of the bicycle, however, shows a black object bound to the bicycle's frame where a water bottle would normally be attached.

B. *The defense case.*

Nero testified.[2] Brown is his older sister and has been his legal guardian since their mother passed away when he was 13. Around 2003 or 2004, Nero was convicted of grand theft and of driving a vehicle without the owner's consent. As a result, he went to prison, where he developed a fear of knives. In 2004, he was shot and hospitalized for two to three weeks.

On the afternoon of September 26, 2006, Nero ran into Yates. Nero had never seen Yates in the neighborhood, but Nero asked him for a quarter to buy a cigarette. Later that night, Nero and Brown went to the liquor store to buy beer. Nero went inside the store, and when he came out, he urinated, and Brown got into their car. Yates approached Brown, who is a lesbian, and called her a "bull dyke" and "bitch." Yates made other comments and hand gestures by moving his hands back and forth. He went to the driver's side of the car and threatened Nero. He challenged Nero to a fight, saying " 'bring it on.' " Nero approached Yates, and Yates hit him. Yates did not appear to be sober.

"Green Eyes" pulled up in a car. Nero asked Green Eyes what he would do if someone disrespected his sister. Green Eyes said it depended on the situation. Green Eyes left, and Yates and Nero resumed fighting. When Nero knelt by the back of his car, he was merely pretending to get a weapon. And when he grabbed the back of his pants, he was merely pulling them up because they were baggy. Yates got a weapon from his bicycle and stabbed Nero's arm, creating a scar that was visible at trial. Struggling over the weapon, the two men fell. Yates dropped the knife.[3] Nero picked it up and stabbed Yates, but he did not intend to kill Yates. Nero dropped the knife.

---

[2] Brown did not testify.

[3] Nero told the police that Yates dropped the knife when he punched him, but, after seeing the video, he agreed that Yates dropped the knife when they tripped over a cement block.

Throughout the altercation between Nero and Yates, Brown was telling them to stop. She never told her brother to fight Yates or encouraged him in any way, and she did not hand him a knife. In his later statement to the police, Nero maintained he acted in self-defense and that his sister told him to stop.

### C. *Rebuttal case.*

Detective Salaam Abdul examined Yates's bicycle, which was never booked into evidence but was instead released to the victim's son. At trial, he could not recall what the black item on the bike was, but he believed it was "some balled up like plastic that looked like it was crunched together." He did not find anything on the bike having, in his opinion, evidentiary value.

### II. *Procedural background.*

Trial was by jury. On October 30, 2007, the jury found Nero and Brown guilty of second degree murder[4] (Pen. Code, § 187, subd. (a)).[5] The jury also found that Nero personally used a deadly weapon (§ 12022, subd. (b)(1)). Both defendants filed motions for a new trial, which the trial court denied. On March 19, 2008, the trial court sentenced defendants to 15 years to life. Nero received an additional one-year term for the weapon-use allegation under section 12022, subdivision (b)(1).[6] This appeal followed.

## DISCUSSION[7]

I. *The trial court did not commit prejudicial error by limiting the video expert's testimony.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *An aider and abettor's liability may be greater or less than the direct perpetrator's.*

During deliberations, the jury asked whether it could find the aider and abettor, Brown, less culpable than the direct perpetrator, Nero. The trial court

---

[4] The jury found both defendants not guilty of first degree murder.

[5] All further undesignated statutory references are to the Penal Code.

[6] The prosecution elected not to proceed on prior allegations.

[7] Part I. of the Discussion is not to be published, but part II. is to be published.

[*] See footnote, *ante*, page 504.

reread an instruction stating that each principal, including aiders and abettors, are "equally guilty." Brown contends that the court's instruction was prejudicial error.[11] We agree.

### A. *Additional facts.*

The People's theory of liability against Brown was that she aided and abetted Yates's murder by handing her brother a knife. The jury was instructed on first and second degree murder (CALJIC Nos. 8.10, 8.11, 8.20, 8.30 & 8.31) and on voluntary manslaughter (CALJIC Nos. 8.37, 8.40, 8.42, 8.43, 8.44 & 8.50). The jury was also instructed on aiding and abetting under CALJIC Nos. 3.00 and 3.01. The trial court gave the jury CALJIC No. 3.00 as follows: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. *Each principal, regardless of the extent or manner of participation, is equally guilty.* Principals include those who directly and actively commit or attempt to commit the acts constituting the crime, or, two, those who aid and abet the commission or attempted commission of a crime." (Italics added.)[12]

After the jury was instructed, the prosecutor argued: "What's the liability? Well, there is someone who is the actual killer. There is someone here who is an aider and abettor to the killing, someone who directly commits that murder and someone who provides aid with knowledge for the unlawful purpose of the perpetrator and encourages or aids the murder. [¶] That equals murder. You heard some jury instructions about principals. A principal could be the person who is the killer. A principal could be a person who aids and abets. They're equally liable."

---

[11] Although Nero, in his reply brief, joined in the arguments advanced by Brown, he did not supply any additional argument on the issue of aider and abettor liability as it applied to his unique circumstance. Joinder may be broadly permitted (Cal. Rules of Court, rule 8.200(a)(5)), but each appellant has the burden of demonstrating error and prejudice (*People v. Coley* (1997) 52 Cal.App.4th 964, 972 [60 Cal.Rptr.2d 870]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [87 Cal.Rptr.2d 754] ["Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice."]). To the extent Nero's cursory joinder was an attempt to raise the aider and abettor issue, his reliance solely on Brown's arguments and reasoning is insufficient to satisfy his burden on appeal. We therefore consider the aider and abettor issue only as to Brown.

[12] The trial court gave the jury CALJIC No. 3.01 as follows: "A person aids and abets the commission or attempted commission of a crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator, and, two, with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and, three, by act or advice aids and abets, promotes, encourages, or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding or abetting."

The jury then began deliberations on the morning of Friday, October 26, 2007. The next day of deliberations, Monday, October 29, the jury asked: "If Brown is an 'aid[] + abet' must she [receive] [the] same level of guilt (or innocence) as Mr. Nero? Can she [receive] a higher or lesser degree of murder, manslaughter, or innocence?" The court told the jury that it had conveyed the question to the attorneys, who were not present, and they agreed on a response. The following exchange then occurred:

"[The court:] The same standard of proof applies to both defendants. What is proven must be proven beyond a reasonable doubt in order to have a conviction. [¶] If the proof fails to reach the standard of beyond a reasonable doubt, either one or both of the defendants are entitled to a verdict of not guilty. [¶] Now for that part of the question, [is] that explanation satisfactory, Mr. Foreman?

"Jury foreperson: If I can speak freely, um, I think where we are at is I think we have come to a consensus about—the way we attacked it is we decided to separate out the two. We have come to a consensus as agree to the culpability for one of the defendants, and we are just concerned that, does the other defendant must receive the same level of culpability, either guilt or innocence, without tipping our hand too much?

"The court: Well—

"Jury foreperson: So, for example, hypothetically, if I may, sir, defendant A, for example, defendant A, we decide they're guilty in the second degree, just for an example, would the person that we have decided guilty of aiding and abetting, would they also be guilty on the second degree, or could they be held to the level of the manslaughter, or completely innocent?

"The court: That's your entire question?

"Jury foreperson: Yes, sir.

"The court: In talking to the lawyers, let me simply say, the aider and abett[o]r can be no more responsible—they are both considered principals, but the person who is the aider and abett[o]r can bear no greater responsibility as far as the degree.

"Jury foreperson: *Could they bear less responsibility?*

"The court: You might conclude that the person who is the aider and abett[o]r—is allegedly the aider and abett[o]r—is not guilty.

"Jury foreperson: Okay.

"The court: Do you understand what I am saying?

"Jury foreperson: Does everybody?

"Juror Number One: That's not it.

"The court: Juror Number One has his hand up . . . . [¶] . . . [¶]

"Juror Number One: I think our problem is we have made a decision about aiding and abetting, but we are concerned about the level of—*given that the defendant would be guilty of aiding and abetting the crime, do they have to have the same—does it have to be of the same level, murder two or manslaughter, or could they be at a lower level? Or you said it can't be the higher level, but could they be at [the] lower level?*

"The court: I understand your question. And before I answer that, I'd probably want to confer with the attorneys to have their approval on how I'd answer it. I don't want to give any answer on this without letting the attorneys know." (Italics added.)

Saying it needed to locate the attorneys, the trial court asked if the jury wanted to continue deliberations or to recess for the day. The jury foreperson said there were some minor issues they could discuss, but that they would have to come back the next day, because "I think in the interest of doing the right thing, we are going to have to do not necessarily what we want to do but what is the right thing." The court, however, proceeded to reread CALJIC Nos. 3.00 and. 3.01, including the statement in CALJIC No. 3.00 that "[e]ach principal . . . is equally guilty." The court added: "So now you have heard the instruction. Again, I know you had them to read, but sometimes, when you read something and you are in a group, sometimes you miss things as you go over things. [¶] Does the rereading of those instructions assist you?

"Juror Number Eight: Yes.

"Jury Foreperson: I think it does.

"The court: I thought they might. So what I am going to say to you . . . in answer, without consulting the attorneys—I have to be careful about that— going to the crime, regarding principals: [¶] Each—and I am picking up the language here—*Persons who are involved in the committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of the participation, is equally guilty.*

Principals include those who directly and actively attempt to commit or commit the act constituting the crime, and . . . those who aid and abet in its commission. [¶] So if that's helpful for you. I will ask you to return to the jury room and do whatever work you can do." (Italics added.)

The next morning, Tuesday, October 30, 2007, the jury returned its verdicts finding both defendants guilty of second degree murder.

### B. *The trial court prejudicially misinstructed the jury.*

Our California Supreme Court has said that an aider and abettor may be guilty of greater homicide-related offenses than those the actual perpetrator committed. (*McCoy, supra*, 25 Cal.4th 1111.) It has not explicitly said whether an aider and abettor may be guilty of lesser homicide-related offenses than those the actual perpetrator committed. *McCoy*, although it does not directly answer the question, nonetheless suggests it.

In *McCoy*, defendants McCoy and Lakey were tried together for crimes arising out of a driveby shooting, during which McCoy drove the car and Lakey was the passenger. Both men shot toward a group of men on the street, killing one man and wounding another. (*McCoy, supra*, 25 Cal.4th at p. 1115.) McCoy fired the fatal shot. He testified he defensively fired the gun because he saw something dark in the hand of one man. A jury found both men guilty of first degree murder and of two counts of attempted murder. A Court of Appeal reversed McCoy's convictions because the jury was prejudicially misinstructed on unreasonable self-defense, which could have reduced McCoy's crimes to voluntary manslaughter and attempted voluntary manslaughter. It was therefore possible on retrial that McCoy, the direct perpetrator, would be convicted of a lesser crime than Lakey, the aider and abettor. Concluding that an aider and abettor cannot be convicted of an offense greater than that for which the direct perpetrator is convicted, where the aider and abettor and the perpetrator are tried in the same trial on the same evidence, the Court of Appeal also reversed Lakey's convictions. (*Ibid.*) Characterizing the issue before it as whether the reversal of McCoy's convictions also required reversal of Lakey's convictions, our Supreme Court reversed the Court of Appeal. It found that Lakey, the aider and abettor, could be guilty of a greater offense than McCoy, the direct or actual perpetrator.

■ *McCoy* reached this conclusion after examining the two types of aider and abettor liability. First, an aider and abettor is guilty not only of the intended crime, but of any other offense that is a natural and probable consequence of the crime aided and abetted. An "aider and abettor may be found guilty of a lesser crime than that ultimately committed by the perpetrator where the evidence suggests the ultimate crime was not a reasonably

foreseeable consequence of the criminal act originally aided and abetted, but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was such a consequence." (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1577 [11 Cal.Rptr.2d 231]; accord, *People v. Hart* (2009) 176 Cal.App.4th 662 [97 Cal.Rptr.3d 827].) Because the jury was not instructed on the natural and probable consequences doctrine, *McCoy* turned to the second type of aider and abettor liability. Under the second type of aider and abettor liability, an aider and abettor with the necessary mental state is guilty of the intended crime. To be found guilty under this second theory of liability, the "aider and abettor must do something *and* [must] have a certain mental state." (*McCoy, supra*, 25 Cal.4th at p. 1117.)

The question here is what can be that "certain mental state"? If, as *McCoy* tells us, an aider and abettor can harbor a "greater," i.e., more culpable, mental state than the direct perpetrator, can the aider and abettor harbor a "lesser" mental state? The People argue that the answer is "no," based on an isolated statement in *McCoy* that "outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*McCoy, supra*, 25 Cal.4th at p. 1118.) By this, the Supreme Court, we believe, was merely making the unremarkable observation that where the intended crime and the charged crime are the same, an aider and abettor's mens rea must at least equal that of the actual perpetrator. (*Id.* at p. 1118, fn. 1.) The court was not saying that in all circumstances an aider and abettor's mental state must be at least equal to the direct perpetrator's.

To the contrary, *McCoy* based its conclusion that an aider and abettor may harbor a greater mental state than that of the direct perpetrator on the premise that one actor's mens rea may not equal another's. "[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants *as well as that person's own mens rea*. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*McCoy, supra*, 25 Cal.4th at p. 1122, italics added.) *McCoy* emphasized, repeatedly, that an aider and abettor's mens rea is personal, that it may be different than the direct perpetrator's: "guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state" (*id.* at p. 1117); an aider and abettor's "mental state is her own; she is liable for her mens rea, not the other person's" (*id.* at p. 1118); aider and abettor liability is "premised on the combined acts of all the principals, but on the aider and abettor's own mens rea" (*id.* at p. 1120).

To demonstrate how an accomplice might be guilty of a greater crime than the direct perpetrator, the court cited Professor Dressler: " 'An accomplice

may be convicted of first-degree murder, even though the primary party is convicted of second-degree murder or of voluntary manslaughter. This outcome follows, for example, if the secondary party, premeditatedly, soberly and calmly, assists in a homicide, while the primary party kills unpremeditatedly, drunkenly, or in provocation. Likewise, it is possible for a primary party negligently to kill another (and, thus, be guilty of involuntary manslaughter), while the secondary party is guilty of murder, because he encouraged the primary actor's negligent conduct, with the intent that it result in the victim's death.' (Dressler, Understanding Criminal Law [(2d ed. 1995)] § 30.06[C], p. 450.)" (*McCoy, supra,* 25 Cal.4th at p. 1119.)

Other authorities cited in *McCoy* have also concluded that an aider and abettor's mens rea is not necessarily tied to the direct perpetrator's. For example, in *People v. Williams* (1977) 75 Cal.App.3d 731 [142 Cal.Rptr. 704], the defendant pulled out a gun and struggled with the victim. The victim tried to get the gun from the defendant. The defendant's sister was watching these events, and, thinking that the victim was going to kill the defendant, she pulled out her own gun. The defendant shouted at her sister to " '[s]hoot him!' " (*Id.* at p. 736.) The sister did, killing the victim. A jury acquitted the sister, but found the defendant guilty of second degree murder. On review, the court found no inconsistency in the verdicts. Explaining the holding in *Williams, McCoy* said that the defendant "used an innocent agent, and was liable for that agent's action even though the agent was herself entirely innocent. We see no reason the outcome should be different if the actual killer was not entirely innocent but instead guilty of a lesser crime than the indirect actor. The same principles should apply whenever a person aids, or perhaps induces, another to kill, whether that other person is entirely innocent . . . , or less culpable, as possibly here, or, potentially, more culpable. In any of these circumstances, each person's guilt would be based on the combined actus reus of the participants, but also solely on that person's own mens rea. Each person's level of guilt would ' "float free." ' [Citation.]" (*McCoy, supra,* 25 Cal.4th at p. 1121.)

This notion that an aider and abettor's mental state "floats free" is from Professor Dressler: " '[A]lthough joint participants in a crime are tied to a "single and common *actus reus*," "the individual *mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt . . . will necessarily be different as well." ' (Dressler, Understanding Criminal Law[, *supra,*] § 30.06[C], p. 450, fns. omitted.)" (*McCoy, supra,* 25 Cal.4th at pp. 1118–1119.) In later editions of his treatise, Dressler agrees that an aider and abettor's guilt may be less than that of the direct perpetrator: "At common law and today, there is no bar to convicting an accessory before the fact or a principal in the second degree of a *lesser* offense or degree of offense than is proven against the primary

party/perpetrator, if the secondary party's culpability is less than that of the primary actor. For example, even if *P* is guilty of first-degree premeditated murder, *S* is properly convicted of second-degree murder if he did not premeditate or if he lacked the specific intent to kill, required elements of first-degree murder. Or, suppose that *S* and *P* walk into *S*'s house and discover *S*'s spouse in an act of adultery with *V*. If *S*, in [a] sudden heat of passion, provides a gun to *P*, who calmly kills *V*, *S* may be guilty of voluntary manslaughter, although *P* is guilty of murder." (Dressler, Understanding Criminal Law (4th ed. 2006) § 30.06[C], p. 524, fns. omitted.)

Nor is the notion that an aider and abettor's mens rea "floats free" new in California law. Irl and Irene Blackwood and their neighbors, the Rootses, shared an outdoor privy, the use of which they clashed over in *People v. Blackwood* (1939) 35 Cal.App.2d 728 [96 P.2d 982] (*Blackwood*). Lavalley, a guest of the Rootses, used the privy. Armed with guns, the Blackwoods confronted Lavalley. James Roots got a gun. Irl suggested that they all throw their guns down, and James Roots immediately complied. Witnesses said that Irl then shot at a girl. Someone tried to disarm Irene, but the gun went off. Irl shot Roots and Lavalley, killing them. There was also some testimony that Irene's gun was jerking as if she were pulling the trigger, but she did not fire any shots. Irl was found guilty of first degree murder, his wife of second degree murder. The trial court reduced Irene's judgments to manslaughter.

On appeal, Irl argued that his judgments should be similarly reduced to manslaughter. (*Blackwood, supra*, 35 Cal.App.2d at p. 731.) The Court of Appeal rejected his argument, as well as Irene's argument that if not coequally guilty with her husband of murder, then she had to be acquitted. "We do not believe that the rule that the two principals are equally guilty is so inflexible that a jury might not find them guilty of different degrees of crime even though they are tried jointly. For the evidence against them is not necessarily precisely the same. The firing of the shots by Blackwood warranted an inference of the malice which is essential to the crime of murder, while Mrs. Blackwood might not be chargeable with guilty knowledge of that malice, but might nevertheless be guilty of aiding and abetting him in the commission of voluntary manslaughter 'upon a sudden quarrel or heat of passion'. . . . For this reason[,] a jury might be justified, in such a case as this, in finding the two principals guilty of different degrees of crime, and the trial court might properly . . . reduce one of the judgments and not the other." (*Id.* at p. 733, citation omitted.)

The Attorney General dismisses *Blackwood* as presenting a "unique and ambiguous fact pattern," inapplicable to the circumstances here because the jury credited the prosecution's theory that Brown handed a knife to Nero. That may or may not be true: we cannot definitively know what the jury

believed about the knife, except that it was undisputed Nero stabbed Yates. In any event, *Blackwood*, by upholding the judgment of manslaughter as to Irene, rejected the idea that an aider and abettor's liability is an all-or-nothing proposition; in other words, that an aider and abettor is either at least equally guilty as the direct perpetrator, or innocent.

More recently, *People v. Samaniego* (2009) 172 Cal.App.4th 1148 [91 Cal.Rptr.3d 874] (*Samaniego*), came to the same conclusion. There, Samaniego and Perdomo were charged with the first degree murder of the victim, who had been shot multiple times. There were no eyewitnesses to the crime and therefore no evidence as to which defendant was the direct perpetrator. The trial court instructed the jury with CALCRIM No. 400, which, like CALJIC No. 3.00, provides: " 'A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. . . . Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.' " (*Samaniego*, at pp. 1162–1163.)

█ Although *Samaniego* found that the defendant forfeited the right to contend on appeal that the instruction was erroneous because it did not inform the jury that an aider and abettor could be guilty of a lesser crime than the perpetrator, the court nonetheless agreed with the contention.[13] It said: "Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. [Citation.] Consequently, CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or

---

[13] In two footnotes, the People similarly suggest that Brown has "arguably forfeited and waived any claim that the court later erroneously responded to the jury's question by failing to request" instructions to amplify or to clarify CALJIC Nos. 3.00 and 3.01. We disagree.

When the jury first asked its question, the trial court consulted with the attorneys, who were not present in court. They agreed that the jury should be told that what is "proven must be proven beyond a reasonable doubt in order to have a conviction." The jury foreperson and another juror, however, informed the court that this did not answer the jury's question. The juror then specifically asked if an aider and abettor could be found guilty of "the same level, murder two or manslaughter, or could they be at a lower level? Or you said it can't be the higher level, but could they be at [the] lower level?" The court said it needed to confer further with the attorneys before it answered that question. Instead of doing so, the court reread the aiding and abetting instructions, including the statement in CALJIC No. 3.00 that "each principal, regardless of the extent or manner of participation, is equally guilty." On this record, Brown's counsel was neither told about the jury's followup question nor consulted about how to answer it. Therefore, even if we assumed that Brown initially forfeited the issue by agreeing to CALJIC Nos. 3.00 and 3.01 in an unmodified form, the issue was "renewed" by the jury's questions and by the court's failure to consult trial counsel about them.

she committed it personally or aided and abetted the perpetrator who committed it' . . . , while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified." (*Samaniego, supra*, 172 Cal.App.4th at pp. 1164–1165, citation omitted.)

We believe that even in unexceptional circumstances CALJIC No. 3.00 and CALCRIM No. 400 can be misleading. Consider what happened here. In addition to the aider and abettor instructions, the jury received instruction on murder and on manslaughter. They were also instructed about the specific intent or mental state necessary for the crimes. For example, they were told that for the "crime charged in Count 1 and lesser crimes thereto, namely, second degree murder and voluntary manslaughter, there must exist a union or joint operation of act or conduct and a certain specific intent or the mental state in the mind of the perpetrator. Unless this specific intent or the mental state exists, the crime to which it relates is not committed." (CALJIC No. 3.31.5.) The jury was also instructed that "you may not find the defendant guilty or the defendants guilty of the crimes . . . in count 1 or the crime of second degree murder and voluntary manslaughter which are lesser crimes, unless the proved circumstances are not only, one, consistent with the theory that the defendant had the required specific intent or mental state, but, two, cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to any specific intent or mental state permits two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to its absence, you must adopt that interpretation which points to its absence. If, on the other hand, one interpretation of the evidence as to the specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (CALJIC No. 2.02.)[14]

■ Notwithstanding that these instructions suggest that Brown's mental state was not tied to Nero's, the jury still asked if they could find Brown, as an aider and abettor, guilty of a greater or lesser offense than Nero. This suggests to us that the aider and abettor instructions—namely, CALJIC No. 3.00—are confusing and should be modified. And where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is "yes," she can be. The trial court, however, by twice rereading CALJIC No. 3.00 in response to the jury's question, misinstructed the jury.

■ This misinstruction was not harmless error. "An instruction that omits or misdescribes an element of a charged offense violates the right to jury trial

---

[14] The jury was also instructed to "decide separately whether each of the defendants is guilty or not guilty." (CALJIC No. 17.00.)

guaranteed by our federal Constitution, and the effect of this violation is measured against the harmless error test of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. [Citation.]" (*Samaniego, supra,* 172 Cal.App.4th at p. 1165.) Under that test, we ask whether beyond a reasonable doubt the jury verdict would have been the same absent the error.

We cannot say, on this record, beyond a reasonable doubt, that Brown would have been found guilty of second degree murder in the absence of the error. The evidence was in dispute. For example, there was a dispute about to whom the murder weapon belonged. A video shows Nero bending by the back of his car, appearing to grab something. But he testified that the knife belonged to Yates, whose bicycle had an object strapped to it that could have been a sheath. Brown's involvement was also disputed. In some scenes from the video surveillance, she adopted a posture that could be interpreted as a plea for help. The prosecutor even agreed that at the "early stages" of the fight between Nero and Yates, Brown was trying to stop it. In another scene, she may or may not have handed something, possibly a knife, to Nero. But Nero testified at trial that his sister did not hand any weapon to him or otherwise encourage or aid him; she instead tried to break up the fight. There was also evidence that Brown may have acted based on a sudden quarrel or heat of passion and provocation. (See generally § 192, subd. (a).) Nero testified that Yates called Brown a "bull dyke" and a "bitch," and made crude hand gestures. There was evidence that Yates threatened and hit Nero, whom Brown had raised after their parents died.

Moreover, the jury indicated it was considering an outcome other than second degree murder for Brown. It expressly asked whether Brown, as the aider and abettor, could "receive a higher or lesser degree of murder, manslaughter, or innocence?" When the trial court's reinstruction on reasonable doubt did not satisfy the jury, the foreperson asked if, for example, they were to find defendant *A* guilty of second degree murder, would the aider and abettor also be guilty of second degree murder "or could they be held to the level of the manslaughter, or completely innocent?" Then, when asked if the aider and abettor could "bear less responsibility," the court only said the person could be found not guilty. But the jury's expressed concern was not whether it could acquit the aider and abettor, but whether the aider and abettor had to be found guilty of "the same level, murder two or manslaughter, or could they be at a lower level?" Without consulting counsel, the court reread, twice, CALJIC No. 3.00, which states: "Each principal, regardless of the extent or manner of participation, is *equally guilty.*" (Italics added.) The jurors then indicated that the instruction answered their question. The next day they found both defendants guilty of second degree murder.

It is therefore clear that the jury was considering whether to impose a lesser degree or offense on the aider and abettor. Notwithstanding that other

instructions might have given them that option, there is a reasonable possibility that the trial court's response to their questions improperly foreclosed it. Indeed, the trial court's response was incorrect in at least one other respect: the court told the jurors that an aider and abettor "can bear no greater responsibility as far as the degree." This, of course, was wrong under *McCoy*'s express holding. The court's misinstruction precluded the jury from finding the aider and abettor guilty of either a greater *or* a lesser offense. This matter must be reversed and remanded as to Brown.

## DISPOSITION

The judgment is affirmed as to defendant and appellant Bennie Nero. The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion as to defendant and appellant Lisa Brown.

Klein, P. J., and Croskey, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 12, 2010, S180778.