Filed 3/23/16  P. v. Williams CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>MARTY J. WILLIAMS ET AL.,<br><br>　　　Defendants and Appellants. | F069253<br><br>(Kern Super. Ct. Nos. BF151132A &<br>BF151132B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant Marty J. Williams.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant David Gregory Marquez

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellants/defendants Marty J. Williams and David Gregory Marquez were jointly tried and convicted of felony offenses resulting from an assault on Troy Basil and Willie Mae Billingsley, which occurred after an argument about a debt. Both defendants punched Basil with their fists, and Williams used a wooden chair leg to hit Basil and Billingsley on their heads. Basil suffered a traumatic brain injury, and Billingsley required multiple stitches in her scalp.

Marquez was convicted of assault with a deadly weapon (the wooden chair leg) on Basil, as an aider and abettor of Williams (Pen. Code, § 245, subd. (a)(1)).[1]

Williams was charged with premeditated attempted murder of Basil (§§ 664/187, 189, subd. (a)), but convicted of the lesser included offense of attempted voluntary manslaughter (§§ 664/192, subd. (a)). Williams was also convicted of assault with a deadly weapon on both Basil and Billingsley.

In this joint appeal, Marquez contends there is insufficient evidence to support his conviction for assault with a deadly weapon on Basil as an aider and abettor of Williams, and argues there is no evidence that he knew Williams intended to use the wooden chair leg to beat Basil. He also challenges the aiding and abetting instructions.

Also on appeal, Williams's appellate counsel has filed a brief that summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) Williams has filed a letter brief and contends his defense attorney was prejudicially ineffective for failing to exclude the victims' testimony. We order the abstract of judgment corrected as to Williams and otherwise affirm as to both defendants.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2

## FACTS

Willie Mae Billingsley (Billingsley), Troy Basil (Basil), and Deidra Hubbard (Hubbard) lived in an apartment on Union Avenue in Bakersfield. David Marquez (Marquez) hung out in the same neighborhood, and frequently visited Billingsley's apartment because he was in a romantic relationship with Hubbard. During his visits, Marquez spoke highly of a man who Billingsley later learned was Marty Williams (Williams).

Sometime in September 2013, Billingsley loaned $35 to Marquez. Billingsley testified the loan did not involve drugs.[2] Billingsley repeatedly asked Marquez to repay the loan, but he failed to do so.

**Billingsley and Basil ask Marquez to repay the debt**

Around 3:00 p.m. on October 3, 2013, Billingsley saw Marquez in the neighborhood, and she again asked when he would repay the debt. Marquez said, "I got you," as if he was going to pay her, but he failed to do so.

Around 7:00 p.m., Billingsley and Basil were standing on their apartment balcony. Billingsley saw Marquez across the street at the Ramkabir Motel. Basil said he wanted to talk to Marquez to collect the debt. Hubbard was not present.

Billingsley and Basil walked across Union Avenue to the motel and went to the room No. 32, where Marquez had been standing. Billingsley and Basil walked into the motel room. Billingsley testified that Marquez, Williams, and a woman were inside.

Billingsley testified she had not personally met Williams, and she did not know his real name. However, she recognized Williams because he had visited someone in her apartment building a few times. She believed his street name was "Psycho."

---

[2] Billingsley testified she had a prior conviction for felony petty theft in 2006. She admitted that she used drugs, but testified she did not use drugs on the day of the assault or when she appeared at trial.

Marquez walked outside the motel room with Basil and Billingsley. Basil asked Marquez for the money. Basil and Marquez walked to the motel's driveway as they talked. Billingsley walked away and did not hear the conversation. Billingsley testified it sounded like Marquez and Basil became angry with each other.

Basil and Marquez talked for five or 10 minutes and then stopped. Basil told Billingsley that they were going to leave, and they walked across Union Avenue and headed to their apartment building. Marquez immediately followed them, and then stopped on the median on Union Avenue. He pointed and yelled, "[S]omebody go get Suspect out of Room 34."[3] Marquez appeared to be yelling at a few people who were standing outside the motel.

## Defendants confront the victims

Marquez continued to follow Billingsley and Basil across Union Avenue to the apartment building. Williams followed Marquez across the street, and ran behind Billingsley and Basil. Billingsley and Basil stood against the apartment building's fence. Marquez and Williams approached them. Marquez partially pulled a knife from his pocket. Billingsley told Marquez, "[D]on't do it." Marquez returned the knife to his pocket without "flicking" it.

Billingsley and Basil headed upstairs to their apartment. While they walked up the back staircase, Billingsley saw Williams run through the apartment building's parking lot. A broken chair was in the area, and Williams picked up a broken leg from the chair. The broken chair leg was about two to two and one-half feet long. Marquez was standing in the middle of the parking lot when Williams picked up the chair leg.

Billingsley and Basil reached the second floor. Williams ran toward the back stairs, still holding the chair leg. Marquez ran to the other staircase. Billingsley and

---

[3] As we will discuss below, Billingsley initially believed Williams's street name was Psycho, but she later learned his street name was "Suspect."

4

Basil tried to hurry to their apartment. However, Williams and Marquez came upstairs from the opposing staircases. Billingsley testified they reached the second floor and "closed in" on them from opposite sides. Billingsley was afraid defendants were going to hurt them.

**Defendants attack the victims**

Billingsley and Basil were within three doors of their apartment when defendants "doubled teamed" Basil. Both defendants punched Basil in the midsection with their fists. Basil tried to punch back and escape, but he fell down. Billingsley testified Williams raised the chair leg above his head and hit Basil's head once "with all his might."

"Q.                          … What was David [Marquez] doing?

"[Billingsley].      Just standing there.

"Q.                          Watching?

"A.                          I assume."

Billingsley testified she got between Williams and Basil, said to stop, and tried to block additional blows. Williams then hit Billingsley in the head with the chair leg.

Basil got up and tried to make it to their apartment. When he reached the doorway, Williams again used the chair leg to hit Basil in the head. Basil fell down and tried to get away. Each time Basil tried to get up, Williams repeatedly hit him in the head with the chair leg. Billingsley testified that she did not see Marquez at this point. Basil passed out and stopped moving. Williams finally stopped hitting him. Marquez and Williams left the area.

**The victims' injuries**

Billingsley tried to revive Basil by splashing water on his face. Basil regained consciousness, and she helped him into the apartment. Billingsley testified Basil "was just sitting there and couldn't talk," and he kept "blacking out."

5

The police and emergency personnel arrived, and both Basil and Billingsley were taken to the hospital. Billingsley testified her head was "busted all the way to the skull." She received 15 stitches "on the outside" of her head and additional stitches "inside."

Basil was admitted to Kern Medical Center's critical care unit. He suffered a depressed skull fracture on the left side of his head, consistent with blunt force trauma, which resulted in a severe traumatic brain injury. He was in critical condition, required a respirator to maintain breathing, and placed in a medically-induced coma to limit ongoing swelling in his brain.

Basil remained in a coma for a week and required ventilator support for two or three weeks. He was discharged from the hospital after about one month. He required a significant amount of support, nursing care, physical therapy, and rehabilitation to regain normal daily functions such as walking, talking, and feeding himself. At the time of trial, Basil had trouble walking, speaking, and with his memory.

**Identification of the suspects**

Billingsley testified that while she was being treated at the hospital, her roommate Hubbard visited her, and they talked about what happened. Hubbard had not been present during the assault. Billingsley kept saying that Psycho attacked them, referring to the second suspect's street name. Billingsley testified that Hubbard replied, "[N]o, it's not Psycho, it's Suspect."

At trial, Billingsley testified that Williams was the man who attacked them with the broken chair leg, and she was only mistaken about his street name and not his identification.

"Q. … But you're confident that no matter what the name, that Mr. Williams here is the person that you've been talking about?

"A. Yes.

"Q. Okay. How sure are you?

6

"A.    I'm 100 percent.

"Q.    Okay.  No doubt in your mind.

"A.    No doubt.

"Q.    How about for Mr. Marquez?

"A.    One hundred percent.

"Q.    Okay.  No doubt in your mind there, either?

"A.    No doubt."

Billingsley testified she also knew someone named "Psycho Mike," but that person was not involved in the assault.

**Basil's identification and trial testimony**

On January 28, 2014, just a few weeks before the trial, an investigator from the district attorney's office met with Basil, and showed photographic lineups, which included defendants' pictures.  Basil was lucid and responsive to questions.  Within five seconds of looking at the separate lineups, Basil identified Williams and Marquez as the men who beat him.  Basil said he was 100 percent sure of his identifications.

At trial, Basil identified both defendants as the men who attacked him.  However, he could not remember the details about the attack.  Basil recalled that he looked at a photographic lineup and identified two people, but he could not remember his prior statements to investigators.  Basil testified he did not have any problems speaking or with his memory prior to the attack.

**Defense evidence**

Williams did not introduce any defense evidence.

Marquez called Bakersfield Police Officer Berumen, who testified he responded to the apartment and spoke to Billingsley at the scene.  Billingsley was hysterical.  She said that someone named "Psycho" attacked her and used a wooden chair or table leg to attack them.

Officer Berumen testified he later spoke to Billingsley at the hospital, where she was calmer. Billingsley said she went to the motel with Basil and confronted "David" because he owed her money. David became angry and called out to Psycho. Billingsley said they left the motel and returned to their apartment. As they were about to go into their apartment, David and Psycho approached from different directions, and Psycho hit her on the head with the wooden object. The two men punched Basil, and Psycho hit Basil twice in the head with the wooden object. Billingsley said she had never before seen Psycho. Billingsley never mentioned Suspect. Billingsley never said they went into Marquez's motel room, or that she saw Psycho in the motel room before the assault.

Officer Berumen testified he returned to the apartment building and found a chair in the parking lot which had been broken into pieces. However, the legs appeared to be intact, and he did not find the chair leg described by Billingsley.

**The charges, verdicts, and sentences**

Both defendants were initially charged with count I, attempted murder of Basil, and that the offense was willful, deliberate and premeditated. (§§ 664/187, subd. (a), § 189); and counts II and III, assault with a deadly weapon (§ 245, subd. (a)(1)), a wooden chair leg, on Basil and Billingsley; with enhancements for infliction of great bodily injury (§ 12022.7, subd. (a)), and great bodily injury which resulted in brain injury or permanent paralysis (§ 12022.7, subd. (b)); personal use of a deadly or dangerous weapon, a wooden chair leg (§ 12022, subd. (b)(1)), and personal infliction of great bodily injury (§ 12022.7, subd. (a)), with multiple prior conviction allegations.

During defendants' joint jury trial, the court granted the People's motion as to Marquez, to dismiss count I, attempted murder of Basil, and count III, assault with a deadly weapon on Billingsley.

As to Williams, the court granted the People's motion to dismiss the personal use enhancements alleged as to counts II and III, assault with a deadly weapon on Basil and Billingsley.

8

Marquez was convicted of count II, assault with a deadly weapon on Basil, with the section 12022.7, subdivision (b) allegation found true, that the victim suffered great bodily injury including brain injury or permanent paralysis.

Williams was found not guilty of count I, the attempted murder of Basil, but guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664/192, subd. (a)). Williams was convicted of counts II and III, assault with a deadly weapon on Basil and Billingsley, with the section 12022.7, subdivision (b) great bodily injury enhancement found true as to Basil, and the section 12022.7, subdivision (a) great bodily injury enhancement found true as to Billingsley.

The court found the prior conviction allegations true for both defendants. Marquez was sentenced to five years. Williams was sentenced to the second strike term of 23 years.[4]

## DISCUSSION

I.    **Substantial Evidence to Support Marquez's Conviction**

In count II, Marquez was tried and convicted of assault with a deadly weapon (the wooden chair leg) on Basil, based on the theory that he aided and abetted Williams. On appeal, Marquez does not contest that Williams's attack upon Basil was an assault with a deadly weapon. Instead, Marquez argues there is insufficient evidence to support his conviction as an aider and abettor. Marquez contends there is no evidence he saw Williams pick up the chair leg, that he knew Williams was going to beat Basil with the chair leg, or that he even encouraged or spoke to Williams. Marquez notes that he and Williams reached the second floor on different staircases, the chair leg was likely not present when defendants punched Basil with their fists, and there is no evidence he knew Williams was going to retrieve the chair leg and start beating Basil. Marquez asserts it

---

[4] The People state that Williams's abstract of judgment must be corrected so that that box No. 4 is checked to indicate he was sentenced pursuant to the Three Strikes law. We order the correction.

was "uncontested" at trial that he was "not present" when Williams hit Basil in the head with the chair leg. As we will explain, the record refutes this claim.

### A. *Substantial Evidence*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.] Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove [her] guilt beyond a reasonable doubt.' " (*People v. Bean* (1988) 46 Cal.3d 919, 932–933; *People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

### B. Aiding and Abetting

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator. (§ 31.)" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*Ibid.*; *People v. Jurado* (2006) 38 Cal.4th 72, 136.)

"Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117 (*McCoy*).)

" 'Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime. [Citation.] However,... "[t]he requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he

11

is a principal and liable for the commission of the offense." ' [Citation.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272–273.)

### C. Analysis

There is substantial evidence to support Marquez's conviction as an aider and abettor of Williams's assault upon Basil. First, Marquez instigated the attack when he followed the victims across the street to their apartment building after they asked him to repay the debt, and he presumably refused. Second, he stopped in the middle of Union Avenue and shouted for someone to get Williams out of room No. 34, demonstrating his intent to escalate the situation and have Williams participate in whatever confrontation he planned. Marquez continued to follow the victims, and Williams ran after him. Third, Marquez and Williams confronted the victims as they stood against the apartment building's fence. Marquez pulled his knife, but for some reason, he returned the knife to his pocket when Billingsley asked him to stop.

The victims headed to their apartment, and the incident appeared to be over. Instead of returning to their motel, however, Williams picked up the broken chair leg in the parking lot, and Marquez was in the parking lot when he did so. There is very strong circumstantial evidence that Marquez and Williams coordinated what followed. When the victims tried to retreat into their second floor residence, defendants used two different staircases to reach the second floor to pursue the victims. Billingsley testified defendant "closed in" on them from opposite sides of the second floor balcony, and "doubled teamed" Basil as they both punched him in the midsection.

On appeal, Marquez asserts the evidence was "uncontested" at trial that he was not present when Williams hit Basil in the head with the chair leg. The record refutes this assertion. As we have recounted in the factual statement, Basil fell down after both defendants punched him with their fists. As Basil tried to get up, Williams raised the chair leg and hit Basil in the head. Billingsley testified Marquez was "[j]ust standing there," and she assumed he was watching as Williams hit Basil in the head. Billingsley

12

tried to get between Williams and Basil, but Williams hit her in the head and knocked her down, and then continued to hit Basil in the head until he stopped moving.

Billingsley testified she did not see Marquez after she was hit in the head, and as Williams delivered additional blows to Basil's head. However, the entirety of the record demonstrates that Marquez was present, and aided and abetted Williams's brutal attack on Basil.

## II.     The Aiding and Abetting Instructions

Marquez contends the court's instructions on aiding and abetting were defective. Marquez concedes he did not object to these instructions but asserts his claim is not waived because the alleged instructional error affected his substantial rights and violated his federal and state constitutional rights to due process. We thus turn to the merits of Marquez's contentions. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 432 (*Bryant*); *People v. Johnson* (2016) 62 Cal.4th 600, 641 (*Johnson*).)[5]

### A.  CALCRIM No. 400

As explained in issue I, *ante*, Marquez was tried and convicted as an aider and abettor for count II, Williams's assault with the chair leg on Basil. Marquez argues that CALCRIM No. 400, defining aiding and abetting, failed to advise the jury that an aider and abettor could be guilty of a lesser crime than the perpetrator.

The jury in this case received the following version of CALCRIM No. 400:

> "A person may be guilty of a crime in two ways: One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.

> "*A person is guilty of a crime* whether he or she committed it personally or aided and abetted the perpetrator." (Italics added.)

---

[5] In the alternative, Marquez argues defense counsel's failure to object to the instructions constituted prejudicial ineffective assistance. We need not reach this argument since we will address the merits of his instructional claim.

13

A previous version of CALCRIM No. 400, which was *not* given in this case, contained the following version of the second paragraph: " 'A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it ....' " (See *People v. Loza* (2012) 207 Cal.App.4th 332, 348, italics added, fn. omitted.)

A series of cases concluded the "equally guilty" phrase was generally correct but could be misleading in certain situations. (See, e.g., *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118, disapproved on other grounds in *People v. Banks* (2015) 61 Cal.4th 788, 809, fn. 8; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164–1165 (*Samaniego*); *People v. Nero* (2010) 181 Cal.App.4th 504, 510, 517–518 (*Nero*) [rejecting similar "equally guilty" language in CALJIC No. 3.00]).) As a result, CALCRIM No. 400 was revised to eliminate the " 'equally guilty' " phrase. (*People v. Loza*, *supra*, 207 Cal.App.4th at p. 348, fn. 8.)

Marquez asserts the revised instruction still fails to convey to the jury that he could have been guilty of a lesser crime than the perpetrator of the offense. In making this argument, Marquez relies on the cases which disapproved of the "equally guilty" phrase in the previous version of CALCRIM No. 400. We thus turn to those cases.

In *McCoy*, *supra*, 25 Cal.4th 1111, the court rejected the notion that an aider and abettor cannot be found guilty of a greater offense than that committed by the perpetrator. *McCoy* observed that aider and abettor liability for a killing is based on the combined acts of all the principals and the aider and abettor's own mental state, which " ' "float[s] free" ' " from the mental state of the perpetrator. (*Id.* at p. 1119.) When the aider and abettor's mental state is more culpable than that of the actual perpetrator, the aider and abettor may be guilty of a more serious crime. (*Id.* at p. 1120.)

*Samaniego* and *Nero* held that *McCoy* supported the further proposition that an aider and abettor's criminal liability may be less than that of the perpetrator, depending on the aider and abettor's mental state. *Samaniego* held that the reference in CALCRIM

14

former No. 400, to principals being " 'equally guilty' " of a crime, was a generally correct statement of the law.  *Samaniego* concluded the instruction was misleading in light of the unique facts of that case, where three defendants were convicted of two counts of first degree murder, but the evidence did not establish which of the three defendants was the actual perpetrator.  (*Samaniego, supra,* 172 Cal.App.4th at pp. 1162, 1165.)  However, *Samaniego* concluded the instructional error was harmless based on the entirety of the instructions, including CALCRIM No. 401:

> "… CALCRIM No. 401 … stated that to prove guilt as an aider and abettor the prosecution was required to prove '1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.'  [¶]  *It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required.*"  (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1166, italics added.)

*Nero* held that CALJIC former No. 3.00, which contained the "equally guilty" phrase similar to CALCRIM former No. 400, could be misleading even in unexceptional cases.  *Nero* concluded the error was not harmless under the circumstances and recommended modification of the instruction.  (*Nero, supra,* 181 Cal.App.4th at pp. 518–519.)

In *Bryant*, *supra*, 60 Cal.4th 335, the California Supreme Court held that former CALJIC No. 3.00 generally stated a correct rule of law, even though it contained the " 'equally guilty' " phrase.  (*Id.* at p. 433.)  *Bryant* noted that "[a]ll principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable."  (*Ibid.*)  *Bryant* also recognized, however, that the instruction could be misleading where principals might be guilty of different crimes, and the jury believes the instruction prevents such a verdict.  (*Ibid.*)

15

In *Johnson*, *supra*, 62 Cal.4th 400, the California Supreme Court addressed the impact of the "equally guilty" phrase in CALCRIM former No. 400. *Johnson* held there was no reasonable likelihood that the jury in that case would have understood that the phrase "allow[ed] them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing." (*Id*. at p. 641.)

*Johnson* reached this conclusion because the jury also received CALCRIM No. 401, "which sets out the requirements for establishing aider and abettor liability. The jury therefore was informed that for them to find defendant guilty of murder as an aider and abettor the prosecution must prove that defendant knew [the perpetrator] intended to kill [the victim], that he intended to aid and abet [the perpetrator] in committing the killing, and that he did in fact aid him in that killing, which would have cleared up any ambiguity arguably presented by CALCRIM former No. 400's reference to principals being 'equally guilty.' This is not a case like [] *Nero, supra,* 181 Cal.App.4th 504, in which the jury expressly asked during deliberations whether it could find the aider and abettor codefendant guilty of a higher or lesser degree of murder than the codefendant who was the actual killer, and the court responded by merely rereading CALJIC former No. 3.00, which included the 'equally guilty' language." (*Johnson*, *supra*, at p. 641.)

**B. Analysis**

Marquez argues that even though the jury in this case received the modified version of CALRIM No. 400, which omitted the "equally guilty" phrase, the instruction still did "nothing to alleviate the fact that, as instructed, the jury must convict an aider and abettor of the same level of offense as that of the actual perpetrator."

As in *Johnson*, this assertion is undermined by the fact that the jury herein received CALCRIM No. 401, which stated in relevant part:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: One, the perpetrator

16

committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, *the defendant intended to aid and abet the perpetrator in committing the crime*; and four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and *he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime*.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor …." (Italics added.)

The instructions in this case did not contain the objectionable language addressed in *Samaniego* and *Nero*, it did not otherwise imply that an aider and abettor must be guilty of the same crime as the perpetrator, and there is no evidence the jury was confused by the instructions. (Cf. *Nero*, *supra*, 181 Cal.App.4th at p. 518; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1590.) Instead, the instructions here required the jury to assess Marquez's culpability separately, including whether he had the mental state necessary for aiding and abetting. As in *Johnson*, we conclude that even accepting Marquez's assertion that the revised version of CALCRIM No. 400 was still misleading, there is no reasonable likelihood the jurors did not understand that they had to base Marquez's liability on his own mental state and not the mental state of Williams.

III.  **Williams's *Wende* Letter**

As explained in the introduction, Williams's appellate counsel filed a *Wende* brief. By letter on December 12, 2014, we invited Williams to submit additional briefing, and he has filed a letter brief.

Williams contends his trial counsel was prejudicially ineffective for failing to pursue various motions to exclude the trial testimony of Billingsley and Basil. Williams argues Billingsley lacked personal knowledge about the identity of the second suspect. Williams asserts Billingsley's trial testimony about the suspect's street name was based

17

on inadmissible hearsay resulting from her conversation with Hubbard, about whether that person was known as Psycho or Suspect. Williams separately argues that counsel should have moved to exclude Basil's trial testimony because he lacked personal knowledge or any memory about what happened.

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

We note that both defense attorneys sought to exclude certain aspects of the proposed trial testimony from Billingsley and Basil. At trial, Billingsley admitted she used drugs, but claimed not to have used narcotics on the day of the assault and at the time of trial. Billingsley also admitted she believed the second suspect's street name was Psycho, and later realized his street name was Suspect based on her conversation with Hubbard. The jury was well aware of Billingsley's conversation with Hubbard about the second suspect's street name, and defense counsel sought to impeach her credibility on this point. As for Basil, his treating physician offered extensive testimony about the extent of his traumatic brain injury, and Basil conceded he could not remember exactly what happened during the attack.

Nevertheless, Billingsley repeatedly testified that the two men who attacked them were Marquez and Williams; Williams used the wooden chair leg; and she was only mistaken about Williams's street name and not his identification.

> "Q. … But you're confident that no matter what the name, that Mr. Williams here is the person that you've been talking about?

18

"A.    Yes.

"Q.    Okay.  How sure are you?

"A.    I'm 100 percent.

"Q.    Okay.  No doubt in your mind.

"A.    No doubt.

"Q.    How about for Mr. Marquez?

"A.    One hundred percent.

"Q.    Okay.  No doubt in your mind there, either?

"A.    No doubt."

We thus conclude that to the extent defense counsel was arguably ineffective, his failure to obtain the exclusion of certain aspects of the victims' trial testimony was not prejudicial.

## DISPOSITION

Williams's abstract of judgment is corrected so that that box No. 4 is checked to indicate he was sentenced pursuant to the Three Strikes law.  In all other respects, the judgment is affirmed.

_____

POOCHIGIAN, J.

WE CONCUR:

_____

GOMES, Acting P.J.

_____

DETJEN, J.

19