Filed 11/13/13  P. v. Cervantes CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068115 |
| v. | (Super. Ct. No. CRF101076) |
| JOSE LUIS CERVANTES, | |
| Defendant and Appellant. | |

Defendant Jose Luis Cervantes and fellow Norteño gang member Michael Mosley fired multiple gunshots into a van driven by rival Sureño gang member Victor Lopez. Victor was injured and his passenger, 16-year-old Jose Chavez, was killed.  A jury convicted defendant of first degree murder, attempted murder, and active participation in a criminal street gang.

Defendant now contends (1) there was insufficient evidence to support instructing the jury on the concurrent intent or "kill zone" theory of attempted murder; (2) use of the

1

words "kill zone" in the attempted murder instruction was inflammatory and the trial court abused its discretion in instructing on the kill zone theory; (3) the trial court erred in not defining the term kill zone; and (4) the prosecutor committed misconduct by telling the jury that an aider and abettor and a direct perpetrator are equally guilty.

We conclude (1) substantial evidence supported instructing the jury on the kill zone theory of attempted murder; (2) it was not improper for the trial court to give the attempted murder instruction with the words "kill zone"; (3) the kill zone theory does not require special instruction; and (4) defendant forfeited his claim of prosecutorial misconduct by failing to object at trial and failing to request an admonition to the jury.

We will affirm the judgment.

BACKGROUND

Sureño gang member Victor Lopez was driving a white van in Yuba City when he saw defendant getting out of a white four-door car. Defendant, a Norteño gang member, wore a red baseball hat with a white colored "N." Norteño gang members wear the color red and clothing with the letter "N" to represent their gang. The Norteño gang is a rival of the Sureño gang.

Victor "flipped off" or extended his middle finger at defendant. Defendant responded by making a "mean face" as if to scare Victor. Moments later, defendant drove his car next to Victor's van.

Tania Flores (now Jimenez) sat in the front passenger seat of Victor's van. Oscar Saavedra and possibly other individuals were also in Victor's van. Oscar was a Sureño gang member. Tania was a Sureño associate.

The people in Victor's van and the people in defendant's car yelled at each other. The occupants of defendant's car called the people in Victor's van "scraps," a derogatory term Norteño gang members use to refer to Sureño gang members. They said "it's all about Norte," referring to the Norteño gang. Defendant's front seat passenger handed

2

defendant a long-barrel black handgun or small rifle, and defendant pointed the gun at Victor's van. Victor quickly drove away.

Victor saw the white car again at about 9:30 p.m. that evening. He was driving Sureño associate Jose Chavez home when he saw the white car behind his van. Victor did not see defendant's face, but he saw the red baseball hat with the white colored "N" that defendant wore. Victor saw another person in defendant's car, but could not see the passenger's face.

Victor turned his van onto Garden Highway; the white car followed him. He saw the headlights of the white car turn off. Seconds later, Victor heard five or six gunshots.

A bullet shattered the driver's side window of Victor's van, passed through the van interior, and exited through the windshield. The shattered glass cut Victor's face. A second bullet penetrated the lower corner of the driver's side window and went through the front passenger seat of the van, where Jose Chavez was located. There was another bullet hole in the rear passenger side door, and a fourth bullet hole just below the rear window, behind the driver's seat.

Jose Chavez sustained two gunshot wounds to his abdomen. He died as a result of his injuries.

A firearms expert opined that an SKS or AK-47 type rifle and a .22 caliber long rifle were likely used during the shooting. One of the bullets that struck Chavez was fired from an SKS or AK-47 type rifle. Shell fragments found on the front passenger seat of Victor's van and on a step on the passenger side of the van came from a .22 caliber shell casing found on Garden Highway. Eyewitnesses did not see any firearms on Victor or Jose Chavez or around the white van, and no firearms were recovered by the authorities.

Victor identified defendant as the driver of the white car. Victor had seen defendant on two or three prior occasions and he said he was 100 percent certain in his

3

identification.  Tania selected defendant's photograph from a photographic lineup.  At trial, Victor and Tania again identified defendant as one of the people in the white car.

Tania identified Michael Mosley as defendant's passenger.  She was 70 percent certain in her identification.

Defendant and Mosley made a number of incriminating statements following the shooting.  Jesus Diaz, who was a Norteño gang member, overheard Mosley brag that he shot someone in a van with an SKS rifle.

Krystal Soto (formerly Machado) testified that two days after the shooting, Mosley said he and defendant shot Chavez, and defendant agreed.  Mosley was upset because a different subset of the Norteño gang claimed credit for shooting Chavez.  Mosley said he and defendant were responsible for the shooting.  He said, "We did that shit.  That's all us right there."  "Did you see it?  . . .  It went through his side and it went through his seat."  Defendant nodded his head in response and said he was the driver and Mosley was the passenger.  According to Soto, defendant said "Yeah, like fuck yeah, you know," agreeing with Mosley's statements.

Antonio Rodriquez, another Norteño gang member, also heard Mosley's statements.  According to Rodriquez, defendant said, "Yeah, we pulled up."

Soto told police that defendant and Mosley were at her house on the morning of the shooting, and defendant and Mosley had guns.  Soto said Mosley had a long brown rifle.  Rodriquez reported seeing defendant on one occasion with a .22 caliber pistol, and also a .22 caliber rifle with a brown-colored stock and black-colored barrel.

Brent Baldwin, a former Norteño associate, heard Mosley brag about killing a "scrap" when Mosley, defendant and Baldwin were in a car together.  Mosley related that he and defendant saw a van drive by and they tried to chase the van.  Mosley said he shot at the Southsiders in the van.  The word "Southsider" refers to a Sureño gang member.  Mosley said, "I can't believe it was with a fucking .22."  Defendant looked in the

4

rearview mirror and said "Yeah, we did that."  Defendant said, "Yeah, we got away with that one.  Who knows how many more we'll get away with."

Yuba City Police Officer Aaron Moe testified as a gang expert at trial.  He described the membership, organizational structure, signs or symbols, and primary activities of the Norteño criminal street gang.  Officer Moe opined that defendant and Mosley were active participants in the Norteño criminal street gang on the day of the shooting, based on self-admission and prior contacts with law enforcement officials.  He concluded the shooting was committed in association with and for the benefit of a Norteño criminal street gang.

Defendant presented an alibi at trial.  Tiffany Sheppard testified that defendant was at her house on the evening of the shooting.  But she had been doing methamphetamine for several days, and later admitted she was uncertain whether defendant was with her that night.

Defendant also presented evidence that on the day of the shooting, Norteño gang member Arturo Esparza retrieved an SKS firearm from a hiding place and drove away with the firearm in a white Chevy Suburban truck.  There was evidence that Arturo and his brother also hid a .22 caliber rifle in the same hiding place.

The jury convicted defendant of first degree murder (Pen. Code, § 187 -- count 1)[1], attempted murder (§§ 664, 187 -- count 2), and active participation in a criminal street gang (§ 186.22, subd. (a) -- count 3).  The jury found that defendant committed the crimes charged in counts 1 and 2 for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in any criminal conduct by gang members (§ 186.22, subd. (b)).  The jury further found that defendant was a principal in the murder, and that in the commission of that

---

[1] Undesignated statutory references are to the Penal Code.

crime, at least one principal personally and intentionally discharged a firearm, causing the death of Jose Chavez (§ 12022.53, subds. (d), (e)(1)).

The trial court sentenced defendant to an indeterminate term of 25 years to life in prison on count 1, with a consecutive term of 25 years to life in prison for the firearm enhancement, and a concurrent indeterminate term of 15 years to life in prison on count 2. The trial court imposed and stayed a three-year prison term on count 3.

DISCUSSION

I

Defendant contends substantial evidence did not support an instruction on the kill zone theory of attempted murder.

The prosecutor argued that defendant intended to kill Victor. The prosecutor also argued the jury could find that defendant intended to kill everyone in Victor's van. Accordingly, the trial court instructed the jury on the attempted murder count pursuant to CALCRIM No. 600, as follows: "The defendant is charged in count II with attempted murder. To prove that the defendant is guilty of attempted murder the People must prove that 1. The defendant took at least one direct but ineffective step toward killing another person and 2. The defendant intended to kill that person. . . . [¶] . . . [¶] A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or quote, kill zone, end quote. [¶] In order to convict the defendant of the attempted murder of Victor Lopez, the People must prove that defendant not only intended to kill Jose Eduardo Chavez but also either intended to kill Victor Lopez or intended to kill everyone within the kill zone. [¶] If you have a reasonable doubt whether the defendant intended to kill Victor Lopez or intended to kill Jose Eduardo Chavez by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Victor Lopez."

Defendant does not claim the given instruction misstates the law. He argues instead that the concurrent intent or kill zone theory of attempted murder did not apply

6

here because the People argued defendant targeted Victor, and the kill zone theory applied only if the alleged attempted murder victim was not the intended target.

Conceding that his trial counsel did not object to the kill zone instruction, defendant argues on appeal that no objection was required because his substantial rights were affected by the erroneous use of the kill zone instruction and his trial counsel rendered ineffective assistance by failing to preserve the objection for review. We address the merits of defendant's claims concerning the CALCRIM No. 600 instruction in parts I, II and III of this opinion to forestall a claim of ineffective assistance of counsel. (*People v. Lewis* (1990) 50 Cal.3d 262, 282.) Regarding his first contention, we conclude there was no instructional error.

It is error for a trial court to give an instruction which has no application to the facts of the case. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "The test for determining whether instructions on a particular theory of guilt are appropriate is whether there is substantial evidence which would support conviction on that theory. [Citation.] To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant to be guilty on the theory presented. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528-529.)

To be guilty of attempted murder, a defendant must (1) intend to kill the alleged victim, and (2) commit a direct but ineffectual act toward accomplishing the intended killing. (*People v. Stone* (2009) 46 Cal.4th 131, 136 (*Stone*).) The California Supreme Court explained in *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*) that intent to kill may be inferred where the defendant uses lethal force calculated to kill everyone within an area around the primary target (a kill zone) as a means of ensuring the primary target's death. (*Bland, supra,* at pp. 329-331 & fn. 6.) In such circumstances, the defendant's

7

intent to kill the primary target is concurrent with the intent to kill those within the kill zone. (*Ibid.*) As the Supreme Court explained, "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the " 'kill zone.' " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. . . .' [Citation.]" (*Id.* at pp. 329-330.)

The California Supreme Court subsequently clarified that a person can be convicted of attempted murder under the concurrent intent or kill zone theory even when there is no primary target. (*Stone, supra,* 46 Cal.4th at p. 140.) A terrorist who places a bomb on an airplane intending to kill a primary target, but ensuring the death of all passengers, can be convicted of the attempted murder of all the passengers. (*Ibid.*) "But a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder." (*Ibid.*) Similarly, assailants who spray an occupied house with high-powered, wall-piercing bullets, intending to kill everyone within, are guilty of attempted murder of all the occupants. (*People v. Vang* (2001) 87 Cal.App.4th 554, 564.) "The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*Ibid.*)

In this case, the jury could have reasonably found that defendant targeted Victor during the shooting because of the earlier gang-related confrontation between defendant and Victor. However, that was not the only possible interpretation of the evidence. The jury could also have reasonably found that defendant recognized Victor's white van as

8

the van involved in his confrontation with rival Sureño gang members, and rather than target a specific person, defendant intended to kill everyone in the white van. Defendant agreed with Mosley's statement that they saw a van drive by, they followed the van, and Mosley shot at the Sureños in the van. Mosley did not say they specifically targeted Victor or Jose Chavez. Defendant carried out his intent to kill the Sureños in the white van by turning off his headlights, pulling up next to the white van, and along with his cohort, firing at least three shots into the front and rear compartments of that van.

Viewed in a light most favorable to the conviction, there was substantial evidence which would support a conviction on the theory that defendant intended to kill everyone in the white van which he associated with Sureño gang members. There was no error in instructing the jury on the kill zone theory of attempted murder.

II

Defendant also contends the words "kill zone" in the attempted murder instruction were inflammatory. He says the use of the kill zone instruction was unnecessary.

With regard to his claim that the term kill zone is inflammatory, defendant acknowledges that his claim is contrary to the holding in *People v. Campos* (2007) 156 Cal.App.4th 1228 (*Campos*). In *Campos,* the trial court instructed the jury pursuant to CALCRIM No. 600, using the words kill zone. (*Id.* at p. 1241.) The defendant asserted that the term kill zone was inflammatory. (*Id.* at p. 1244.) The appellate court disagreed, stating that "CALCRIM No. 600 merely employs a term, 'kill zone,' which was coined by our Supreme Court in *Bland* and referred to in later California Supreme Court cases. [Citation.] It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury. Other disparaging terms, including 'flight' (CALJIC No. 2.52), 'suppress[ion] of evidence' (CALJIC No. 2.06) and 'consciousness of guilt' (CALJIC No. 2.03) have been used in approved, longstanding CALJIC instructions. We see nothing argumentative in this instruction." (*Ibid.*)

9

It is improper for a trial court to give an instruction which is argumentative, "i.e., [an instruction] of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1276, overruled on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835.) We agree, however, with *Campos* that the term kill zone is not argumentative or inflammatory. The challenged instruction did not inflame the passions of the jury, did not invite the jury to draw inferences favorable to either party, did not characterize the evidence in a manner adverse to defendant, and did not tell the jury that a kill zone had been created.

Although the kill zone theory does not require a special jury instruction, a trial court may use the CALCRIM No. 600 instruction, which uses the term kill zone, at its discretion. (Bench Note to CALCRIM No. 600 (2011) p. 410; *Stone, supra*, 46 Cal.4th at pp. 137-138.) It was not improper for the trial court to use the term kill zone where, as here, the charge was supported by substantial evidence.

Defendant also argues the term kill zone suggested that he "was a person of bad character prone to committing violent acts," thereby violating his right to due process under the federal Constitution. To the contrary, the instruction suggested nothing about defendant. Rather, it explained the concurrent intent theory to the jury in a neutral fashion. The trial court told the jury that it must find defendant not guilty of the attempted murder if it had a reasonable doubt whether the defendant intended to kill Victor or intended to kill Jose Chavez by killing everyone in the kill zone.

The term kill zone was not inflammatory and the trial court did not abuse its discretion in using the kill zone instruction.

### III

Defendant next argues the trial court erred in failing to define the term kill zone. Recognizing that the California Supreme Court rejected this argument in *Stone, supra*,

46 Cal.4th 131 and *People v. Smith* (2005) 37 Cal.4th 733, defendant attempts to rest his claim on federal constitutional grounds.

The California Supreme Court has said the kill zone theory does not require special jury instruction. (*Bland, supra*, 28 Cal.4th at p. 331, fn. 6.) Thus, we reject defendant's assertion that the trial court must define the term kill zone sua sponte. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In any event, the given instruction told the jury that the kill zone is the particular zone of harm in which defendant intended to kill everyone present.

Defendant maintains his appellate claim is supported by federal precedent. But none of the federal authorities he cites discusses the concurrent intent theory or holds that a trial court must define the term kill zone when instructing the jury on attempted murder.

Accordingly, we conclude defendant's claim lacks merit.

IV

Defendant further contends the prosecutor committed misconduct by telling the jury that an aider and abettor and a direct perpetrator are equally guilty.

The prosecutor argued the jury could find that defendant personally committed the murder of Jose Chavez or, in the alternative, that defendant aided and abetted the murder. Defendant complains about two comments by the prosecutor during closing argument. In explaining aiding and abetting, the prosecutor said: "The classic example is the bank robbery where you got the get-away driver in the car waiting outside. He doesn't go inside the van [*sic*]. He doesn't have a gun. He doesn't put it in the cashier's face. He doesn't take money and run out of the bank. But the bank robber couldn't get away without the assistance of the driver and by aiding and abetting someone, knowing he's going to go in there and rob a bank waiting for him to be the get-away driver he's equally guilty of the robbery."

Moreover, in the context of explaining the charge of active participation in a criminal street gang, the prosecutor said defendant aided and abetted Mosley with regard

11

to the murder and attempted murder, arguing that for the general principle of aiding and abetting, "[y]ou're equally guilty whether you do it yourself or help somebody else. He may have only been the driver. He may not have fired a gun himself, but it doesn't matter because he aided and abetted someone who did."

Defendant forfeited his claim of prosecutorial misconduct by failing to object at trial and failing to request an admonishment to the jury. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [failure to object on constitutional grounds at trial forfeits appellate contention that prosecutorial misconduct violated constitutional protections].) He nonetheless maintains that an objection was not required because the prosecutor's statements irreparably tainted the trial. Failure to object and to request an admonition does not result in forfeiture where the prosecutor's misconduct is of such a character that a timely admonition to the jury could not cure the error caused by the misconduct. (*People v. Kirkes* (1952) 39 Cal.2d 719, 726.) Defendant summarily states that the "devastating effect" of the prosecutor's remarks was incurable, but he does not show how a timely admonition to the jury would not have cured any prejudice caused by the prosecutor's statements. We need not consider an appellate claim made in a perfunctory fashion and without supporting argument. (*People v. Jones* (1998) 17 Cal.4th 279, 304.)

Even if we were to consider defendant's claim of prosecutorial misconduct, however, we would find it unmeritorious because under the evidence presented the prosecutor did not misstate the law.

Aider and abettor liability attaches where (1) the aider and abettor knows the unlawful purpose of the direct perpetrator, (2) the aider and abettor intends to commit, encourage or facilitate the commission of the offense, and (3) the aider and abettor's acts or advice aids, promotes, encourages or instigates the commission of the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) When the charged offense is murder, the aider and abettor must know and share the murderous intent of the direct perpetrator.

12

(*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).)  An aider and abettor's guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and mental state.  (*Id.* at p. 1117.)

Because an aider and abettor's culpability depends on his own mental state, in certain circumstances an aider and abettor may be guilty of a greater or lesser crime than the direct perpetrator.  (*McCoy, supra,* 25 Cal.4th at p. 1120; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.)  Thus, the "equally guilty" language has now been omitted from the current version of CALCRIM No. 400.  Nonetheless, courts have concluded that the former language is a generally correct statement of law.  (*People v. Lopez, supra,* 198 Cal.App.4th at p. 1119; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163-1165.)

Where the defendant is accused of aiding and abetting the intended crime, his mental state must be at least equal to that of the direct perpetrator.  (*McCoy, supra*, 25 Cal.4th at p. 1118; *People v. Nero* (2010) 181 Cal.App.4th 504, 514.)  With regard to Chavez, the crime intended and committed was murder.  The evidence clearly established that defendant shared Mosley's murderous intent, and that defendant aided and abetted Mosley in committing murder.  Defendant does not point to any evidence that could have made him less culpable than Mosley in Chavez's murder.  (Contra, *McCoy, supra*, 25 Cal.4th at p. 1122 [one of two shooters may be less culpable because he was acting in self-defense]; *People v. Nero, supra*, 181 Cal.App.4th at p. 509 [direct perpetrator claimed self-defense].)  Under the circumstances, the prosecutor's argument that defendant and his cohort were equally guilty of murder was not erroneous and did not prejudice defendant.

Additionally, defendant does not contend that the aiding and abetting instruction given to the jury was erroneous.[2]  The trial court told the jury to follow its instructions,

---

[2]  The trial court instructed the jury that a person may be guilty of a crime in two ways: (1) as a direct perpetrator or (2) as an aider and abettor.  It instructed, pursuant to

13

not counsel's argument. We presume the jury understood and followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

Defendant also claims the prosecutor attempted to persuade the jury to convict him without proof beyond a reasonable doubt of the required elements of the crime. But the trial court instructed the jury on the People's burden to prove beyond a reasonable doubt that defendant committed murder. And the prosecutor correctly explained the People's burden of proof and the elements of aiding and abetting liability. The prosecutor did not attempt to shift the burden of proof to defendant.

DISPOSITION

The judgment is affirmed.

                                                                    MAURO            , J.


We concur:


          ROBIE            , Acting P. J.


          MURRAY          , J.

---

CALCRIM No. 401: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime the [P]eople must prove that 1. The perpetrator committed the crime. 2. The defendant knew that the perpetrator intended to commit the crime. 3. Before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime. And 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime."

14