Filed 8/15/24  In re I.D. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re I.D., a Person Coming Under the Juvenile Court Law. | B333797 (Los Angeles County Super. Ct. No. 18CCJP00557B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>  Plaintiff and Respondent,<br><br>         v.<br><br>C.D. et al.,<br><br>  Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Conditionally affirmed and remanded.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant C.D.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant D.D.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

## I.　INTRODUCTION

In a prior appeal in this matter (*In re I.D.* (May 17, 2022, B311124))[1], C.D. and D.D., mother and father of now 11 year old I.D. (the child), contended the juvenile court erred when it terminated their visitation with the child; mother also contended the court erred when it denied her Welfare and Institutions Code section 388[2] petition that sought to change the court's order terminating her family reunification services. We affirmed the court's orders. Following further proceedings on remand, the court terminated mother's and father's parental rights to the child pursuant to section 366.26. Mother and father appeal, contending the court erred in denying them visitation and the court and the Los Angeles County Department of Children and Family Services (Department) failed to satisfy their inquiry

---

[1]　On our own motion, we take judicial notice of the prior opinion. (Evid. Code, § 452, subd. (d).)

[2]　All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

duties under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California statutes (§ 224 et seq.).[3]  We conditionally affirm and remand.

## II.  BACKGROUND

A.  *Prior Appeal*

The following background facts are taken from the prior opinion in this matter, *In re I.D., supra*, B311124:

"A.  *First Amended Section 300 Petition*

"On April 24, 2018, the Los Angeles County Department of Children and Family Services (Department) filed a first amended section 300 petition that alleged, as ultimately sustained, that on or about January 14, 2012, mother and father engaged in domestic violence and a protective restraining order was issued against father; on numerous occasions, the parents violated the

---

[3]  Mother and father purport to join each other's arguments. "Joinder may be broadly permitted (Cal. Rules of Court, rule 8.200(a)(5)), but each appellant has the burden of demonstrating error and prejudice (*People v. Coley* (1997) 52 Cal.App.4th 964, 972 . . . ; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 . . . ['Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice[]'][.])[ ]"  (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)  Neither parent "spells out" how the other parent's arguments apply to them and thus their "joinders" are deficient.

restraining order requiring law enforcement intervention.  It further alleged that mother had a history of alcohol abuse and was a current user of alcohol and marijuana; on prior occasions mother used alcohol and marijuana while caring for the children[4]; and mother had passed out from alcohol intoxication in the children's presence and the children were unable to wake her.

"B.      *Jurisdiction/Disposition Report and Hearing*

"In its April 16, 2018, Jurisdiction/Disposition Report, the Department reported that A.P. and I.D. were placed with maternal aunt E.H.  A.P. told a social worker that mother drank too much alcohol.  Mother sometimes became drunk.  On two occasions, she passed out.

"The juvenile court removed the child from the parents' care.  It ordered reunification services for mother and father.  Mother was ordered to participate in a full drug and alcohol program with weekly random or on demand testing.  She was also to participate in a 12-step program, developmentally appropriate parenting education, and individual counseling to address case issues including domestic violence and anger management.  The court granted mother monitored visitation with the child for a minimum of two to three hours, two to three times per week.  Mother was not permitted to visit the child with father.

"The juvenile court ordered father to participate in a 52-week domestic violence program and a developmentally appropriate parenting program.  He was to comply with criminal

---

"4      The first amended petition was filed with respect to the child and her sibling, A.P.  A.P. is not a subject of this appeal.

4

court orders.  The court granted him monitored visitation with the child for a minimum of two to three hours, two to three times per week.  He was not to visit the child with mother.

"C.    *Six-Month Review Report and Hearing*

"In its January 10, 2019, Status Review Report for the six-month review hearing, the Department reported that mother was working diligently to complete her court-ordered services.  Mother and the child had had 'consistent [and] meaningful' visits during which they bonded.  The child appeared to enjoy the visits, singing, "'I love my mommy.'"  The visits appeared to have had 'so much impact' on the relationship between mother and the child that E.H. scheduled additional time for them to be together.

"Although father had not visited the child consistently, when he did visit, the visits were 'meaningful.'  The child appeared to enjoy visits with father.

"In a Last Minute Information for the Court for the six-month review hearing, the Department reported that father's last face-to-face contact with the child was on October 29, 2018.  As of January 10, 2019, father had not started his parenting class.  Father told the social worker that he was attending domestic violence classes, but refused to provide contact information or the class's location.

"In a second Last Minute Information for the Court, the Department informed the juvenile court that on December 19, 2018, E.H. reported that mother was sending her threatening messages and was being aggressive on the phone.  She did not feel comfortable giving mother additional visitation.

"The child's counselor stated that the child was 'experiencing many trauma-related symptoms including anxiety, depression, intrusive thoughts, avoidance, arousal, and disassociation.' E.H. reported to the counselor an 'improvement in functioning' when the child did not have visitation with mother. Among other things, the child was calmer, listened better, and did not show defiance.

"The counselor stated that the 'stressor of visitation with her mother is likely contributing to trigger trauma symptomology. *It is of concern that with these triggers* [*the child*] *continues to exhibit an acute trauma state. Should this continue this can result in a very guarded prognosis and potential significant neurodevelopmental consequences.* The negative impact of continuing visitation should be considered in light of functional status concerns.'

"The juvenile court granted mother unmonitored visitation with the child for a minimum of two to three hours, two to three times per week in a public setting. Father was not to be present for the visits. Mother was not to threaten E.H.

"D.    *The Department's February 19, 2019, Section 388 Petition*

"On February 19, 2019, the Department filed a section 388 petition requesting the juvenile court to change its order for unmonitored visits for mother. Instead, it requested an order that visitation take place in a therapeutic setting, mother's educational rights be given solely to E.H., and mother participate in a full psychological evaluation.

"E.H. was worried about the quality of mother's visits with the child due to the child's behavior after the visits. After visits,

6

the child had a "'nasty attitude,'" did not listen, and hit her cousin. It took a couple of days for the child's behavior to 'get back on track.'

"On January 24, 2019, E.H. told the social worker that the child said she spoke with father on the phone during a visit with mother. The child disclosed to E.H. that she always spoke with father during visits with mother. E.H. also told the social worker that the child's school principal informed her that mother had called the school making threats, using derogatory language, and requesting the child be kicked out of school because she was not being taken care of and not doing her homework.

"On February 5, 2019, the social worker spoke with the child privately. The child said she and mother 'share secrets that [mother] doesn't want her to share.' The social worker asked the child how visits with mother went. The child responded, "'[G]ood.'" She reported that she spoke with father during visits.

"On February 8, 2019, the social worker spoke with the child's school principal. The principal stated that mother called the school yelling and screaming that the child was not doing her homework and should be kicked out of school. Mother "'appeared erratic and was possibly under the influence.'"

"The child's therapist recommended that visitation with mother and father be reevaluated in light of the child's reported 're-traumatization.'

"On April 18, 2019, the juvenile court granted the Department's section 388 petition. It ordered mother's visitation with the child be monitored in a therapeutic setting. E.H. was appointed the child's educational rights holder. Mother was to participate in a psychological evaluation.

"E.    *May 3, 2019, Last Minute Information for the Court*

"In a May 3, 2019, Last Minute Information for the Court, the Department reported that father had provided proof that he had completed a domestic violence program.  Father had not attempted to visit the child—his last visit was on October 29, 2018.

"F.    *May 3, 2019, Six-Month Review Hearing*

"At the May 3, 2019, six-month review hearing, the juvenile court continued reunification services for mother, but terminated reunification services for father.

"G.    *Mother's July 1, 2019, Walk On Request*

"On July 1, 2019, mother filed a walk on request concerning her lack of visitation.  She noted the juvenile court ordered her visits be in a therapeutic setting, but she had not had any visits with the child as of June 27, 2019.  The court ordered the Department to ensure that mother's visits with the child took place in a therapeutic setting.

"H.    *Eighteen-Month Status Review Report*

"In its August 28, 2019, Status Review Report for the 18-month review hearing, the Department reported that the child remained placed with E.H.  Father had been consistent with visits with the child.  The child enjoyed visits with father, her half-brothers, and paternal grandmother.  She also enjoyed her

one visit with mother on August 3, 2019, and looked forward to future visits and phone calls with her.

"Mother had completed an in-patient drug treatment program at Cri-Help.  Mother completed seven of 18 scheduled drug tests.  On July 1, 2019, mother tested positive for opiates and Hydrocodone.  She told the social worker the positive test was the result of medication given to her at the hospital for her gallbladder.  The social worker requested hospital records concerning mother's claim.

"Mother claimed to be attending Alcoholics Anonymous and Narcotics Anonymous and to be working on her 12-step program.  Mother did not provide proof of attendance during the recent period of supervision and last gave proof of attendance on August 4, 2018.  Mother claimed she completed a psychological evaluation on July 18, 2019, but did not provide documentation for her claim.  The Department gave mother several referrals for low cost and no cost individual counseling.  Mother stated she was working on having her Medi-Cal reinstated so she could resume counseling.

"The Department recommended that mother's reunification services be terminated and the matter be set for a section 366.26 hearing.

"The juvenile court continued the 18-month review hearing ultimately to January 29, 2020.

"I.    *October 16, 2019, Last Minute Information for the Court*

"In an October 16, 2019, Last Minute Information for the Court, the Department reported the therapist who served as the visitation monitor opined that mother could safely have

9

unmonitored visitation with the child under certain conditions: mother had to provide proof of a valid driver's license and car insurance; visits should not exceed three to four hours; mother had to provide a clean drug and alcohol test to document sobriety; and visits should be scheduled on days when mother had adequate rest.

"In a second October 16, 2019, Last Minute Information for the Court, the Department reported that mother and the child had monitored visits on August 25, 2019, and on September 7, 15, and 22, 2019. The therapist monitored phone calls between mother and the child on September 4, 11, and 18, 2019. The visits and phone calls were uneventful and appropriate except for one visit when mother became agitated and discussed case issues with the social worker in front of the child. During the September 15 visit, the child and mother appeared to have a 'good interaction and the hugs and kisses seemed natural and reciprocal.'

"Father had visits with the child on September 4, 11, 18, and 25. He canceled a visit on October 2, 2019.

"On September 1, 2019, the child was placed with maternal uncle R.D. and aunt R.D. The caregivers requested the juvenile court make a no-contact order for mother and father. They expressed their unwillingness to have any contact with the parents.

"J.    *Father's December 12, 2019, Section 388 Petition*

"On December 12, 2019, father filed a section 388 petition requesting the juvenile court reinstate family reunification services, return the child to him, grant him unmonitored visits,

10

and approve mother to monitor visits with the child. Father stated that he had consistently and meaningfully visited with the child and had completed parenting and domestic violence classes.

"The Department filed a response to father's section 388 petition. It stated that father had visited the child nearly every week for two to three hours since June 12, 2019. Father and the child shared a strong father-daughter bond. Father was always appropriate during visits. The child stated on several occasions that she loved visiting father and frequently became upset when visits ended. Father also had completed his court-ordered case plan. The Department recommended that the juvenile court reinstate family reunification services for father and grant him unsupervised visits not to exceed five hours; mother was not to be present during father's unsupervised visits. It further recommended the court not place child with father.

"K.  *January 29, 2020, Last Minute Information for the Court*

"In a January 29, 2020, Last Minute Information for the Court, the Department reported that mother's discharge plan from Exodus Recovery Urgent Care Center stated that mother had been diagnosed with adjustment disorder. She was advised to follow up with treatment at BAART Community Healthcare. Mother did not follow up with treatment because further treatment was recommended, but not required.

"Mother completed a residential alcohol dependence program at Cri-Help and a parent education course. Mother was participating in individual counseling and had completed seven sessions. According to mother's counselor, she appeared to

11

understand her past mistakes and to be facing them honestly and engagingly.

"Mother had six negative drug tests from December 12, 2019, to January 21, 2020. From December 15, 2019, to January 22, 2020, mother had nine monitored visits with the child and one visit mother canceled.

"In a January 3, 2020, telephone conversation with a social worker mother appeared to be under the influence. Mother was slurring her words, speaking very slowly, and not making sense. Mother denied she was under the influence. The same day, maternal aunt E.E. told the social worker that mother had appeared to be under the influence during a telephone conversation on December 22, 2019. E.E. stated that mother slurred her words and spoke slowly and had threatened to report her to the IRS for filing false tax returns.

"On January 17, 2020, mother exchanged text messages with the child's foster mother[5] concerning an upcoming visit. When the foster mother told mother she was unable to monitor a visit both to a movie and a pizza restaurant, mother responded, "'That is my daughter. You get paid for her so what I want to do, I should be able to. Don't tell me pizza only.'" The social worker spoke with mother about how she communicated with the child's foster mother.

"The Department recommended the juvenile court terminate mother's reunification services.

---

"5     The child had been re-placed from maternal uncle and aunt's home.

"L.    *January 29, 2020, Eighteen-Month Review Hearing*

"At the January 29, 2020, eighteen-month review hearing, the juvenile court terminated mother's reunification services.  It granted part of father's December 12, 2019, section 388 petition, reinstating reunification services.

"M.    *Mother's July 13, 2020, Walk On Request*
"On July 13, 2020, mother filed a walk on request for, among other things, monitored visits in her home.  The juvenile court ordered the Department to assess monitored visitation in mother's home and provide any change in recommendation in its next report.  It set the matter for a permanency planning review hearing on September 29, 2020.

"N.    *Permanency Planning Status Review Report*

"In its September 29, 2020, Status Review Report for the permanency planning review hearing, the Department reported that on July 14, 2020, mother reported that she and father had recent verbal altercations and 'they had the police called' due to father coming to mother's residence unannounced.
"The social worker contacted father about the incident mother described.  Father said mother was lying and she was the one who was being aggressive.  He helped mother financially with her residence and was the primary lessee on mother's home.  Father admitted he was in an "'on again, off again'" relationship with mother.  Mother and father reported that their relationship was tumultuous, but they remained in constant communication and contact.

13

"Due to COVID-19 state protocols, father's visits with the child were held by video from March 17, 2020, to May 13, 2020. Thereafter, they had weekly visits for a minimum of four hours. The child reported that father allowed mother to call and video chat during their unmonitored in-person visits. When the social worker spoke with father about the need to comply with court orders, he agreed not to allow mother access to the child during his visits.

"The child reported that visits with father lacked substance and meaningful contact. The child wanted to have more of an opportunity to bond with father as he rarely spent the visitation time with her. After her September 13, 2020, visit with father, the child told the social worker that her visits with father were 'not very good.' She reported that father would leave for an hour or two every visit to buy food and routinely slept for several hours during visits.

"Mother's visits with the child had been consistent, but the 'appropriateness' of mother's visits concerned the Department. Mother continued to need redirection to provide emotionally positive feedback to the child during visits. Mother encouraged the child to have visits with her and father together.

"The child stated that she loved mother, but she did not like that mother lied. When asked what mother lied about, the child responded that mother told her to listen only to mother and not to her caregiver or the social worker. The child loved her parents, but wished they could "'be good and listen to the rules.'"

14

"O.     *Mother's December 29, 2020, Section 388 Petition*

"On December 29, 2020, mother filed a section 388 petition seeking to change the juvenile court's order terminating her family reunification services.  Instead, mother wanted the court to return the child to her custody, reinstate family reunification services, or grant unmonitored and overnight visits.

"Mother contended a change of circumstances supported the petition because she attended individual counseling twice a month, was sober, and was willing to prove her sobriety through random testing but could not afford it.  She spoke with her sponsor daily and visited the child when the Department arranged visits and called to talk about the child's well-being weekly.  Finally, she had completed a residential treatment program and a psychological evaluation at Exodus.

"Mother contended the requested order would be in the child's best interest because the child 'was a seven year old girl who ha[d] a close and bonded relationship with her mother.  She ha[d] been quoted as saying she love[d] her mother in [the Department's] reports filed with the Court.  It [was] in [the child's] best interest to be returned to her mother's care and have the least amount of restrictions and interference on the quality of time she [could] spend bonding with her mother.'  The juvenile court set mother's section 388 petition for a hearing.

"In its February 16, 2021, response, the Department stated that mother did not want the child to attend individual therapy and also did not want to attend conjoint therapy with the child.  The child and her caregiver consistently reported to the social worker that mother appeared under the influence of drugs and/or alcohol during video/telephone calls.  Mother attempted to

15

intimidate the child, caregiver, and social worker by yelling or being aggressive.

"On December 31, 2020, the child told the social worker that she felt scared to be around mother for in-person visits because mother would become angry and yell at everyone. Mother told her to lie if anyone asked about mother or father doing anything bad. Then, mother lied and said the child was not telling the truth. The child was willing to have one monitored telephone call with mother per week. She did not want to have in-person visits with mother as mother was always mean and angry.

"P.     *January 5, 2021, Last Minute Information for the Court*

"In its January 5, 2021, Last Minute Information for the Court, the Department reported, 'During this period of supervision, mother's quality of visits has significantly changed.' The child reported she did not enjoy mother's calls or visits because mother was overly aggressive and excessively agitated during contact with her. When mother missed her scheduled calls with the child, she tended to yell at or continuously call the caregiver and the social worker. Mother's demeanor and inability to work with the Department saddened and upset the child.

"Mother asked the child to lie and not listen to the Department or her caregiver. The Department, caregiver, and child were concerned that mother called the child when mother was under the influence of drugs and alcohol. The child and caregiver created a safe word that allowed calls to end prematurely. During the recent period of supervision, most calls ended early.

16

"As of December 31, 2020, the child requested to not have in-person visits with mother because she did not feel safe with mother's behavior. The child also did not want to have video calls with mother. Mother smoked cigarettes and drank alcohol during video calls. The child requested one monitored telephone call per week with mother.

"Father continued to violate the juvenile court's order by allowing mother to participate in his visits with the child. He took the child to mother's home and encouraged the child to lie about the unauthorized contact with mother.

"The child reported that father did not talk to her very much and displayed little to no affection during visits. She did not spend much time alone with father. Father could be very easy going, but got angry easily and scared her. Father yelled often, causing the child to cry. She described multiple times when father did not pay attention to her or her safety. In their most recent visit, father made her feel bad about revealing that her parents were visiting her together. She reported that father was angry and yelled at her because she told the truth. The child believed father was angrier when he was with mother. She stated she wanted to have visits with father, but only with a monitor for one or two hours per week "'if he is nice and listens.'"

"Q.    *Mother's January 21, 2021, Emergency Walk On Request*

"On January 21, 2021, mother filed an emergency walk on request to restore her FaceTime visits with the child. The Department opposed mother's request. It stated the child had consistently refused to have FaceTime or video chats with mother since December 25, 2020. The child was not comfortable with

17

such visits as mother smoked and drank alcohol during them. Mother also asked the child to walk away from the caregiver so that the visits could be unmonitored.

"On February 16, 2021, the juvenile court granted mother's request to restore her FaceTime visits with the child. It ordered the Department to have a staff member monitor the visits.

"R. *February 16, 2021, Last Minute Information for the Court*

"In a February 16, 2021, Last Minute Information for the Court, the Department reported that there was no in-person or video contact between mother and the child from January 6, 2021, to February 10, 2021, because the child refused to visit with mother. During roughly the same period, there were no visits with father, apparently because father refused to accede to the child's request that visits be monitored.

"The child did not want in-person visitation with mother or father. Mother and father yelled and fought a lot when the child was present. She felt like she was in the middle when her parents fought. The child and the caregiver reported to the social worker that mother drank alcohol and smoked cigarettes during the video calls. The caregiver stated that mother appeared under the influence of alcohol during video calls.

"S. *March 8, 2021, Last Minute Information for the Court*

"In a March 8, 2021, Last Minute Information for the Court, the Department reported that mother and father had existing visitation schedules, but the child refused visitation. The child reported, "'I don't feel that my mom and dad are doing

18

what they are supposed to during visits. . . . My mom and dad will always have visits together at my mom's house, and they are not supposed to do that . . . . My parents always tell me not to tell on them.'"

"The child continued, "'My mom and dad scare me. I feel like they are going to be mad because now everyone knows the truth. And I am tired of lying for them. And now they are calling me the liar and making me look like I'm the bad one.'" According to the child, mother and father drank alcohol and smoked during video calls. The child had begun to display 'anxious' behaviors on or around the time of her phone calls with mother and father.

"During a February 24, 2021, phone call, mother asked the child why she was refusing to visit. Mother repeatedly called the child a liar, said she was mean for refusing to visit, and yelled and used profanity. The caregiver had to intervene.

"In a March 3, 2021, phone call, mother called the child a liar and said "'this was all [the child's] fault for telling on them.'" The child asked mother why she was in child care if mother loved and took good care of her. Mother yelled and screamed at the child.

"The next day, the child told the social worker that she thought mother would try to do something bad to her, her caregiver, or the social worker. She believed that if her parents could not get her back through juvenile court proceedings, they would make it hard for her to be with anyone else.

"The child refused visits with mother and father from the middle of February to the beginning of March 2021.

"Around December 2020, the Department connected the child with Wraparound services. Mother and father were

contacted and asked to participate with the team on the child's behalf. They refused.

"T. *March 11, 2021, Hearing on Mother's Section 388 Petition and Review of Permanent Plan*

"At the March 11, 2021, hearing on mother's section 388 petition and review of permanent plan, mother testified that since the juvenile court sustained the section 300 petition, there had been no domestic violence incidents with father or anyone else, she was sober, and she had not used any illegal drugs or alcohol. She was attending a virtual Alcoholics Anonymous-like program.

"Mother had been unable to drug test for the prior six months because she could not afford to and due to the Corona virus. If the juvenile court granted her additional reunification and ordered drug testing, she would be willing to drug test.

"On July 10, 2018, mother completed the Cri-Help residential substance abuse program. She had been attending individual counseling once a week and was currently attending once a month.

"Mother denied that she ever yelled at the child during a visit. When asked if she accused the child of lying during a visit, mother responded that when the child said that father brought the child to mother during visits—which never happened—she told the child to "'tell mommy the truth,'" and the child confessed that she had lied. Mother asked the child why she had lied and the child responded that she thought she would get to come home faster.

"Mother denied that she used alcohol or smoked during virtual visits with the child. Mother was concerned that the social worker was telling her to say those things. In addition to requesting visitation and family reunification services, mother wanted a new social worker who would not intimidate the child or speak ill of the child's parents.

"Mother believed it was in the child's best interest to reunify with her because they had a good bond, the child knew how much mother loved her, and the child called mother her best friend.

"The juvenile court asked mother about her participation in her 12-step program. Mother responded, 'I am working currently always 8 through 12.' The court asked if mother could explain step seven as she must have completed it recently. Mother responded, 'I have been working on it, but I haven't read the step.' Mother spoke with her sponsor twice a day.

"Mother's counsel argued the juvenile court should grant mother's section 388 petition because there had been a change in circumstances as 'mother was able to articulate today her tools for sobriety. She does the A.A. online meetings. She is in 12-steps. She speaks with a sponsor twice a day. She articulated her support system. And she has done the Cri-Help residential program. She is sober at this time.' Mother had not been testing only because she could not afford it. She took responsibility for the domestic violence with father.

"Mother's counsel argued that the changes requested in mother's section 388 petition were in the child's best interest because the child had said in the past that she loved mother, mother testified the child loved and was excited to see her, and mother and the child had a strong bond. Mother had been

fighting for the child, and it was in the child's best interest to be removed from foster care and placed in mother's home.

"The juvenile court denied mother's section 388 petition. The court acknowledged that mother had participated in services, but found that she had not benefited from them. Mother believed that everyone was lying about her—the child, the caregiver, and the social worker. The court found the child and social worker were credible, but mother was not.

"Further, the juvenile court was concerned, based on the caregiver's reports, that mother was showing up 'under the influence.' It also found that mother and father had not made progress 'in the domestic violence' as they continued to violate the court's orders about separate and monitored visits and argued in front of the child.

"The juvenile court found that there had not been a change in circumstances—mother had continued in programs, but she had not changed. It further found that the proposed order was not in the child's best interest as the visits were causing the child a lot of anxiety.

"After addressing mother's section 388 petition, the juvenile court asked whether it had to address father's reunification services. The Department's counsel responded, 'Your Honor, I don't believe that is on calendar today. I believe it is just the R.P.P. [(review of permanent plan)] and mother's services and mother's 388.' The court acknowledge that the matter had been called for a review of permanent plan hearing, but stated that at such a hearing it appropriately could address whether to terminate the services it ordered as part of father's successful section 388 petition. The Department's counsel agreed. Father's counsel objected, stating that family

reunification and mother's section 388 petition were on calendar, but whether to terminate father's reunification services was not.

"The juvenile court then turned to 'the visitation issue' and asked the child's counsel for her position. The child's counsel asked the court to make a detriment finding as to both parents regarding visitation based on her argument in connection with mother's section 388 petition and the most recent Last Minute Information for the Court. She argued that the child did not enjoy the visits and recently had refused visits as they were 'so anxiety inducing.'

"The child's counsel stated she had earlier addressed mother's detrimental visits with the child. As for visits with father, the child refused visits on February 28 and March 7, crying because she feared visiting with father. The child's fear was related to the parents violating court orders, telling the child to lie, and becoming upset with her when she told the truth. The child had been 'extremely clear' that visits with father were not good for her and she did not want to participate in them. Also, father refused to participate in Wraparound services and the child's Wraparound team made clear that visits needed to be limited or stopped.

"Mother's counsel asked the juvenile court to deny the child's counsel's request to terminate visitation. Counsel stated that the social worker had not been helping mother and the court should disregard the social worker's reports about mother's visits. Instead, the court should accept mother's testimony about the visits 'and the fact that none of this is true and that this child is being brainwashed and is caught in the middle of the [Department]. And this is what is causing [the child's] issues, not . . . mother's behavior.' According to mother's counsel, the

23

Department was 'actively thwarting' mother's contact with the child and coaching the child about what to say about her desire for contact with mother.

"Father's counsel agreed with mother's counsel, stating that the Department had done 'everything to sabotage this family.' He argued that the Department had inappropriately delegated to the child whether visits would take place. There had been no indication from a psychiatrist or social worker that the visits were detrimental and no physical evidence of detriment such as the child shaking or breaking out in hives.

"The Department's counsel asked that father's family reunification services be terminated. Counsel noted that father was entitled to six months of family reunification, the juvenile court had ordered family reunification on January 29, 2020, over a year prior, and the child had not been returned to father. Because reunification had not occurred within six months, family reunification had to be terminated. The court stated, 'That is part of an R.P.P. hearing,' and asked the Department's position on terminating mother's and father's visitation.

"The Department's counsel argued that there was detriment to the child—she had expressed numerous times that she did not want to visit either parent. The child had been 'astute enough' to tell when mother had been under the influence.

"The juvenile court terminated visitation for mother and father, finding by clear and convincing evidence that the visits were detrimental as the parents continued to traumatize and re-traumatize the child. The court stated, 'The parents are continuing to engage in the very conduct that was sustained initially in the original petition, and they are re-traumatizing [the child.] [¶] I don't have to find that [the child's] mental

24

health is deteriorated to the degree that she has to be hospitalized or needs to be medicated or things like that. She is a fairly resilient little girl. There are many other children who wouldn't be this resilient. She's on the cusp. She is on the brink of really being pushed too far mentally and emotionally. [¶] This isn't a case of just unruliness because the child decided she doesn't want to visit.'

"The juvenile court found father and mother were not credible. It further found it implausible that the child would make up statements about how mother acted during visits, that she was afraid of father, or that mother and father fought in front of her.

"Moreover, father violated the juvenile court's order by allowing mother to have unmonitored visits." (*In re I.D., supra*, B311124.)

B.  *Facts After Mother and Father Filed Their Appeals in In re I.D., supra, No. B311124*

On April 6, 2021, the juvenile court terminated father's reunification services (it terminated mother's reunification services on January 29, 2020) and set the matter for a section 366.26 permanency planning hearing.

On July 28, 2021, the child told a social worker, "'I want to talk to my parents, but I am afraid they will yell and be mad at me.'" On August 10, 2021, the social worker attended a meeting with the child's mental health team to discuss telephone visits between the child and mother and father. The team would not provide a recommendation, but reported that "since the

25

termination of contact with parents, the team has seen much progress with [the child's] goals."

On August 24, 2021, mother filed a section 388 petition asking the juvenile court to reinstate her visitation with the child. The court denied the request.

On December 10, 2021, father filed a section 388 petition asking the juvenile court to reinstate his visitation with the child. The court denied the request.

On December 15, 2021, the juvenile court ordered the appointment of an independent evaluator pursuant to Evidence Code section 730 to evaluate the "need and importance" of visits between the child and mother and father.

On March 2, 2022, the social worker asked the child if she wanted to visit with mother. The child responded she would be interested in visiting with mother, but not alone. She stated she was afraid to visit with the parents alone, but would not disclose why she was afraid. She would be comfortable with monitored visits. The child had last visited with her parents the previous Thanksgiving, she missed them, and would love to see them.

On June 2, 2022, the Department filed in the juvenile court the Evidence Code section 730 evaluator's report. The evaluator reported the child "made conflicting statements regarding her thoughts about visitation and feelings towards her parents. She initially stated that she loved and missed them and wanted to see them, but later expressed feeling nervous, afraid, uncomfortable, and reluctant to restart visitations with them."

According to the evaluator, the child did not "seem to have a stable, strong, or close relationship with her parents" and appeared to have "both positive and negative feelings towards them." Though the child "remain[ed] uncertain, the fact that she

26

ha[d] continued to express interest in visiting with her parents to multiple people indicate[d] that visitations with her parents should be further explored and considered." (Emphasis omitted.)

The evaluator recommended that visits between mother and the child begin after mother's therapist and the child's therapist agreed that mother and the child were ready for visits. She recommended that visits between father and the child begin after the child's therapist had spent a few sessions with the child preparing her for visits. The evaluator recommended that someone with whom the child felt safe and secure monitor the visits.

At a section 366.26 permanency planning hearing on June 10, 2022, the juvenile court stated it had reviewed the evaluator's report. The court then denied mother's and father's request to reinstate visits with the child.

The juvenile court explained the evaluator's report did not present new evidence, it only recommended that visits take place when future conditions were met. The court found compelling the evaluator's conclusion that neither mother nor father was "self-aware about the problems. And that has always been the court's issue in this case. So I find the detriment continues. There is no change in circumstances. The mere fact that a child, at times, indicates that she want[s] visits is not compelling evidence to order visits. . . . I can rely on the attorneys' request on behalf of her client that visits not begin. Further, I find it compelling that there has been an improvement in her behavior since she stopped visiting with parents. Also, the court gives extraordinary weight to the need to continue stability for [the child.] That means that she remain in a current placement. This current placement is excellent. I'm very concerned, especially as [the child] starts to

27

head into puberty, that the placement could be sabotaged or disrupted . . . if her improvement is interrupted by visits with parents."

On September 16, 2022, the juvenile court ordered the Department to discuss with the child's Wraparound team visitation between the child and mother and father.  In its November 23, 2022, Status Review Report, the Department reported that "[a]s of September 2022, [the child's] former Wraparound . . . team indicated that [the child] is not ready to resume visitation with either of her parents."

In its June 7, 2023, section 366.26 report, the Department reported that on May 11, 2023, the child's therapist informed a social worker that the child stated she was not ready to resume contact and visitation with her parents.

At a June 9, 2023, section 366.26 permanency planning hearing, the juvenile court ordered the Department to assess whether mother could have in-person or phone visits with the child.  The Department was to interview the child only once.

In a September 7, 2023, Last Minute Information for the Court, the Department informed the juvenile court that the child's therapist had indicated on several occasions that the child had not expressed an interest in resuming telephone calls with mother.  Also, a social worker had interviewed the child about having telephone calls or visits with mother.  The child responded, "'I'll let you know when I'm ready.'"

In a December 5, 2023, Last Minute Information for the Court, the Department informed the juvenile court that the child continued to decline any contact with mother and father and would "say when she [was] ready to have any contact with them."

In a December 6, 2023, Last Minute Information for the Court, the Department reported that the child was not interested in receiving letters from mother or father.

At a December 8, 2023, section 366.26 hearing, the juvenile court terminated mother's and father's parental rights.

C.   *ICWA Facts*

The Indian Child Inquiry Attachment to the Department's January 26, 2018, section 300 petition stated the child had no known Indian ancestry.  The attachment identified maternal aunt L.H. as the "Person(s) questioned" and the apparent source of that information.  The Department's Detention Report of the same date stated ICWA did not apply.

Mother's January 28, 2018, Parental Notification of Indian Status form stated mother had no Indian ancestry as far as she knew.

At the January 29, 2018, detention hearing, at which mother appeared but father did not, the juvenile court asked mother if she knew if father had or might have American Indian ancestry.  Mother responded, "[N]ot that I know of."  The court found it did not have a reason to know the child was an Indian child and ordered mother and father to keep their attorneys, the Department, and the court aware of any new information relating to possible ICWA status.

At a March 10, 2023, section 366.26 permanency planning hearing, the juvenile court ordered the Department to "[a]ddress in re Caden C. [(*In re Caden C.* (2021) 11 Cal.5th 614)] analysis[ and] ICWA ancestry inquiries . . . ."

In its November 15, 2023, status review report, the Department reported contact with maternal aunt E.E. on November 2, 2023.  E.E. "stated that to her knowledge, she and her siblings [did] not have any affiliations nor are they registered with any Indian American tribe."

The record identifies other maternal extended family members whom the Department contacted but did not ask about the child's possible Indian ancestry:  maternal aunts E.H. and R.D., maternal uncle R.D., maternal grandmother M.D.[6], and maternal cousin B.D.

The record does not contain a Parental Notification of Indian Status form for father or evidence the Department asked father about the child's possible Indian ancestry.  The record also reflects that the Department had contact with paternal grandmother A.H., who lived with paternal grandfather (no name provided), and two paternal uncles (both with the initials D.D.) but did not ask any of these relatives about the child's possible Indian ancestry.  The record also reflects that father had another brother, with the initials D.D., but did not provide contact information for him.

### III.   DISCUSSION

A.    *Visitation*

On March 11, 2021, the juvenile court terminated mother's and father's visitation with the child.  We affirmed that ruling. (*In re I.D., supra*, B311124.)  In this appeal, mother and father

---

[6]    Maternal grandmother apparently passed away during the pendency of the proceedings in the juvenile court.

30

contend the juvenile court abused its discretion and violated their "rights to familial association and fair and meaningful access to the courts under the First and Fourth Amendments of the United States Constitution" when it denied them visitation with the child in the period after it terminated visitation. They argue the court improperly delegated the visitation decision to third parties, and its denial of visitation violated their due process right to prove the parental-benefit exception to adoption (§ 366.26, subd. (c)(1)(B)(i)). The court did not err.

Section 366.21, subdivision (h) provides, in part, "In any case in which the court orders that a hearing pursuant to Section 366.26 shall be held, it shall also order the termination of reunification services to the parent or legal guardian. The court shall continue to permit the parent or legal guardian to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." We review a juvenile court's visitation order for an abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

"Where a juvenile court orders visitation, the court shall specify the frequency and duration of visits. [Citation.] The time, place, and manner of visitation may be left to the legal guardians, but the guardians shall not have discretion to decide whether visitation actually occurs. [Citations.] A juvenile court likewise may not improperly delegate decisions over whether visitation will occur to a [third party]." (*In re Grace C.* (2010) 190 Cal.App.4th 1470, 1478.)

The juvenile court did not abuse its discretion in declining to reinstate visitation between the child and mother and father. The court appointed an Evidence Code section 730 evaluator to assess the benefits of visitation. Based on the evaluator's report,

31

the court found there was a continuing detriment to visitation—both parents were still not "self-aware about the problems" in the case, the child did not want to visit her parents, and the court was concerned that visitation would disrupt the improvement in the child's behavior since she stopped visiting with the parents.

Also, the juvenile court did not delegate visitation decisions to a third party. Instead, based on input from social workers, the child's therapist, and the Evidence Code section 730 evaluator, it denied mother's and father's requests to reinstate visitation.

## B.  *ICWA*

Mother and father contend the juvenile court and the Department failed to satisfy their inquiry duties under ICWA and related California statutes to interview father and known and available maternal and paternal extended family members about the child's possible Indian ancestry. We agree.

From its initial contact with a minor and the minor's family, the Department has a duty of inquiry to ask all involved persons whether the child might be an Indian child. (*In re H.V.* (2022) 75 Cal.App.5th 433, 437, citing § 224.2, subds. (a), (b).) Section 224.2, subdivision (b) "specifies that once a child is placed into the temporary custody of a county welfare department, such as the [Department], the duty to inquire includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members,[7] others who have an

---

7      Under ICWA, "extended family member" includes "the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child. [Citation.] [Citation.] [¶] We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V., supra*, 75 Cal.App.5th at pp. 437–438, internal quotation marks and citations omitted.)

We agree with mother and father that this case involves reversible error because there was noncompliance with the inquiry requirements of ICWA and related California law. (*In re H.V., supra*, 75 Cal.App.5th at p. 438.) Specifically, the Department did not interview the child's maternal extended family members aunts E.H. and R.D., uncle R.D., or cousin B.D., or father or paternal extended family members grandmother A.H., grandfather, or uncles D.D. about whether the child had Indian ancestry. We therefore conditionally affirm the order terminating mother's and father's parental rights and remand for further proceedings to ensure compliance with ICWA and related California law.

## IV.  DISPOSITION

The juvenile court's orders terminating mother's and father's parental rights under section 366.26 are conditionally affirmed and remanded for proceedings required by this opinion. On remand, the court shall order the Department to make reasonable efforts to interview father and available extended maternal and paternal family members about the possibility of the child's Indian ancestry and to report on the results of the Department's investigation.  Nothing in this disposition precludes the court from ordering additional inquiry of others having an interest in the child.  Based on the information reported, if the court determines at a noticed hearing that no additional inquiry or notice to tribes is necessary, the orders terminating mother's and father's parental rights shall be reinstated.  If additional inquiry or notice is warranted, the court shall make all necessary orders to ensure compliance with ICWA and related California law.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

I concur:

MOOR, J.

34

In re I.D.
B333797


BAKER, Acting P. J., Concurring


I agree with much of the opinion for the court.

C.D. and D.D.'s challenge to the juvenile court's denial of visitation is an argument that admittedly has some force. But I am persuaded the juvenile court's visitation orders were not error. The expert evaluator appointed by the court believed restarting visits between I.D. and the parents should be "considered," but only after I.D.'s therapist confirmed the child was ready for such visits. That day never came before the juvenile court was compelled to make a permanency determination, however, and in light of the evidence about the adverse effect of prior visits on I.D., the court's visitation decision was justified.

As to the parents' Indian Child Welfare Act (ICWA) argument, I agree there was error because the juvenile court never made ICWA-related inquiry of D.D. I disagree, however, with the broad ICWA-related directions the majority fashions for the juvenile court to follow on remand. I would remand with directions that *require* asking only D.D. whether he has any Indian ancestry and leave the juvenile court free to undertake additional inquiry that it believes appropriate under the circumstances. (See, e.g., *In re A.C.* (2022) 86 Cal.App.5th 130, 145 (dis. opn. of Baker, J.) ["Social services agencies should take seriously the potential sources of tribal membership information

specified in section 224.2 and inquire of parents and other family members likely to have relevant information.  But the juvenile courts must manage that process in the first instance and our review should be appropriately deferential, looking at the sufficiency of the evidence for a juvenile court's determination that an adequate inquiry has been made to determine whether a child is an Indian child"].)


BAKER, Acting P. J.


2