Filed 9/3/24  P. v. Magana CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

JOSE MAGANA,

    Defendant and Appellant.

B332105

(Los Angeles County
Super. Ct. No. BA129512)

 

APPEAL from an order of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In 1996, defendant and appellant Jose Magana was convicted of second degree murder. (Pen. Code, § 187.)[1] He was sentenced to 16 years to life in state prison. Defendant appealed his conviction, and on October 29, 1997, we affirmed the judgment. (*People v. Magana* (Oct. 29, 1997, B106669) [nonpub. opn.] (*Magana I*).)

On January 31, 2019, defendant filed a petition for resentencing under section 1172.6.[2] The trial court summarily denied his petition. Defendant appealed, and on June 2, 2020, we affirmed the trial court's order. (*People v. Magana* (June 2, 2020, B297514) [nonpub. opn.] (*Magana II*).) As relevant to the issues in this appeal, we rejected defendant's argument that "because the jurors were instructed with CALJIC No. 3.00, which contains the misleading phrase 'equally guilty,' they could have found defendant guilty of murder based only upon the direct perpetrator's malice, rather than his own." (*Magana II*, *supra*, B297514.)

On February 15, 2023, defendant filed a second petition for resentencing. After the appointment of counsel, briefing from the parties, and a hearing, the trial court denied the petition. Defendant timely appealed. Relying upon the passage of Senate Bill No. 775 (2021-2022 Reg. Sess.), he argues that the trial court's instruction pursuant to CALJIC No. 3.00 "afforded the jurors an avenue to convict [defendant] as a direct aider and abettor through the imputation of the direct perpetrator's malice."

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Defendant actually filed his petition pursuant to section 1170.95. Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10). For simplicity, we refer to the section by its new numbering.

2

We are not convinced by defendant's argument. Accordingly, we affirm the trial court's order.

## FACTUAL BACKGROUND

"On June 25, 1995, Miguel Garcia dropped Alex Campos off at Alex's house, and rode his bicycle to his house two blocks away to get a sweater. Alex's house was in a territory claimed by the Primera Flats street gang. Alex's brother, Julio Campos, was outside the house when Alex arrived home. Alex went across the street with his friends, and Julio went inside the house. Alex's sister Juana was on her way home from a friend's house when she saw Alex approach a black car that had just passed her. Miguel returned to the house at that time, and the black car passed him. He noticed that the car pulled up by Alex. Miguel saw that the driver was an overweight, bald, Hispanic man. The passenger asked Alex, 'Where are you from?' Alex answered, and the passenger took a gun out and shot him. Alex instinctively raised his hands, and tried to run. Alex fell to the ground, and the passenger continued to shoot him. The firing stopped and the vehicle sped away. Alex was mortally wounded. Juana Campos and Veronica Gudino also witnessed the shooting. Veronica covered Alex after the shooting, felt for a pulse, and told people to call the police.

"Miguel and Juana identified the shooter as Miguel Funes [(Funes)]. Juana identified [defendant] as the driver.

"Police officers interviewed [defendant], who stated that on June 25, 1995, he was with a couple of friends, including Miguel Funes. Someone asked [defendant] to get the neighborhood gun. He went into his house and retrieved it. Funes took possession of the gun and they decided to drive around. They saw someone on a bicycle, and approached him and another young man standing near him. They asked the man without the bicycle where he was from, and when he replied he was from Primera Flats, Funes shot

3

him approximately six times.  They drove away, and [defendant] dropped off Funes at home.  [Defendant] stated that he did not know Funes was going to shoot anybody.

"Officer Daniel Jaramillo testified that the Al Capone gang occupied a small area within the housing projects and was surrounded by the Primera Flats street gang, which began infringing on the Al Capone territory in the 1990's.  The rivalry between the two gangs resulted in physical altercations and shootings.  Jaramillo testified that he had witnessed Al Capone gang members commit a drive-by shooting of a Primera Flats gang member.  He also investigated a second shooting of a Primera Flats gang member by an Al Capone gang member.  He testified that when a gang member asks, 'Where are you from?' he is issuing a challenge.  The answer could result in no incident, an altercation, or a shooting.  Officer Jaramillo came into contact with [defendant] in 1993, when he claimed to be a member of the Al Capone gang.

"Julio was able to identify the vehicle used in the shooting.  At trial, Julio testified that a few weeks prior to his brother's murder, the same vehicle had approached him while he was riding his bicycle.  After asking him where he was from, the occupant tried to shoot him with a shotgun, but the gun did not go off.

"[Defendant] testified that he belonged to the Al Capone gang for seven or eight years previous to the shooting.  A few days before the shooting, Funes came to [defendant's] house and asked him to keep a gun for him.  On June 25, 1995, Funes visited [defendant], asked for the gun, and asked for a ride.  When [defendant] gave the gun to Funes, it was unloaded.  Even though at trial he stated that he was concerned that Funes had a gun in his car, he did not protest when Funes wanted to cruise in his car with a gun.  Indeed, he stated he wanted to be part of the

4

gang, and allowed people to ride in his car who he knew were carrying guns. He also testified that he was aware that his gang committed drive-bys and shot people. He knew that there was a war going on between the Al Capone gang and Primera Flats gang, and that Al Capone gang members had shot or tried to shoot members of Primera Flats gang. [Defendant] and Funes were cruising when they saw Alex and Miguel. [Defendant] stopped the car near them. Funes asked Alex where he was from, and when Alex answered 'Flats,' he shot him. [Defendant] testified that he was not aware that Funes was going to shoot. However, he waited until Funes was finished shooting, then sped away from the scene and drove Funes home." (*Magana I*, *supra*, B106669.)

## DISCUSSION

Defendant urges us to "conclude that cases in which the jurors were instructed with the 'equally guilty' language as contained within then CALJIC No. 3.00 should be included within the legislative concerns that underlie [Senate Bill Nos.] 1437 and . . . 775 and are not categorically excluded from Penal Code section 1172.6 resentencing consideration simply because the jurors were not instructed on either a felony murder or natural and probable consequences doctrine."

I. *Relevant law*

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) in 2018, effectively abolishing the natural and probable consequences doctrine in cases of murder and limiting the application of the felony murder doctrine. (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Lewis* (2021) 11 Cal.5th 952, 957.) With one narrow exception (§ 189, subd. (f)), the legislation bars murder convictions premised on any theory of imputed malice—that is, any theory by which a person can be convicted of murder for a killing committed by someone else—unless the

5

People also prove that the nonkiller defendant personally acted with the intent to kill or was a major participant who acted with reckless disregard for human life.  (§§ 188, subd. (a)(3) & 189, subd. (e); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843, superseded by statute on other grounds as explained in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

"Section 1172.6 expressly states that its resentencing provisions apply only where the 'petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189.'  [Citation.]" (*People v. Garcia* (2023) 93 Cal.App.5th 416, 424.)  In other words, a petitioner is not entitled to resentencing if he could be convicted under still valid theories of murder.  (See, e.g., *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 392.)

Senate Bill No. 1437 also created section 1172.6, which "provides a mechanism whereby people 'who believe they were convicted of murder for an act that no longer qualifies as murder following the crime's redefinition . . . may seek vacatur of their . . . conviction and resentencing by filing a petition in the trial court.' [Citation.]" (*People v. Arnold* (2023) 93 Cal.App.5th 376, 382.)

Effective January 1, 2022, Senate Bill No. 775 amended section 1172.6 to broaden the eligibility pool of those entitled to resentencing.  (§ 1172.6, subd. (a); *People v. Saibu* (2022) 81 Cal.App.5th 709, 747; *People v. Vizcarra, supra,* 84 Cal.App.5th at p. 388.)  Those eligible for relief now include persons convicted of murder under any "theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a).)

II.  *The trial court did not err*

Applying these legal principles, we conclude that the trial court correctly denied defendant's petition for resentencing.

While we agree that Senate Bill No. 775 expanded the scope of section 1172.6 relief, it is not so broad as to include situations such as the instant one—where the jury was not instructed on a theory that would have allowed the jury to impute Funes's malice to defendant. In other words, defendant is ineligible for relief because his jury was not instructed on any theory of imputed malice.

Relying upon *People v. McCoy* (2001) 25 Cal.4th 1111, 1122, *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164–1165, and *People v. Nero* (2010) 181 Cal.App.4th 504, 518 (*Nero*), defendant contends that the CALJIC No. 3.00[3] "constructively allowed the jurors to convict" him by imputing malice.

We are not convinced. (See *People v. Burns* (2023) 95 Cal.App.5th 862, 865, 868–869.) For the reasons set forth in *Magana II*, defendant shared the actual perpetrator's (Funes) intent: He gave Funes a gun and drove around with him in a rival gang territory in the midst of a gang war; he knew that Funes was going to shoot someone.[4] (*Magana II*, *supra*, B297514.)

Furthermore, as we noted in *Magana II*, "while the phrase 'equally guilty' in CALJIC No. 3.00 might be misleading and confusing in certain cases (*Nero*, *supra*, 181 Cal.App.4th at p. 518), there is no indication that the jury here was confused and

---

[3] That instruction provided: "The persons concerned in the [commission] of a crime who are regarded by law as principals in the crime thus [committed] and equally guilty therefore include: [¶] 1. Those who directly and actively [commit] the act constituting the crime, or [¶] 2. Those who aid and abet the [commission] of the crime." (*Magana II*, *supra*, B297514.)

[4] Defendant's claim is also barred by the doctrine of law of the case for the same reasons set forth in *Magana II*, *supra*, B297514.

7

mistakenly convicted defendant based upon the shooter's, as opposed to his own, malice. After all, the jury was also instructed with CALJIC No. 3.01. (*Magana I*, *supra*, B106669.) Any potential misdirection in CALJIC No. 3.00 was cured by CALJIC No. 3.01's clear requirement of what the jury must find in order to convict defendant as an aider and abettor. (*People v. Amezcua & Flores* (2019) 6 Cal.5th 886, 917–919.)" (*Magana II*, *supra*, B297514.) Reading CALJIC No. 3.00 "in the context of the instructions and record as a whole" (*People v. Vang* (2022) 82 Cal.App.5th 64, 84), it is clear that the jury found that defendant personally possessed a particular mental state—specifically, knowledge of the unlawful purpose of the shooter and the specific intent to encourage or facilitate the killing—to find him guilty of murder. (See *People v. Johnson* (2016) 62 Cal.4th 600, 638, 640–641.)

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT